**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARY ANGELA CAFASSO, United
States ex rel.,
     *Plaintiff-counter-defendant-*
*Appellant,*

    v.

GENERAL DYNAMICS C4 SYSTEMS,
INC.,
     *Defendant-counter-claimant-*
*Appellee.*

No. 09-16181

D.C. No.
2:06-cv-01381-
NVW

MARY ANGELA CAFASSO, United
States ex rel.,
     *Plaintiff-Appellant,*

    v.

GENERAL DYNAMICS C4 SYSTEMS,
INC.,
     *Defendant-Appellee.*

No. 09-16607

D.C. No.
2:06-cv-01381-
NVW

MARY ANGELA CAFASSO, United
States, ex rel.,
         *Plaintiff-counter-defendant-*
                        *Appellant,*

              v.

GENERAL DYNAMICS CORPORATION,
              *Defendant-Appellee,*

GENERAL DYNAMICS C4 SYSTEMS,
INC.,
         *Defendant-counter-claimant-*
                        *Appellee.*

No. 09-17710

D.C. No.
2:06-cv-01381-
NVW

OPINION

Appeal from the United States District Court
for the District of Arizona
Neil V. Wake, District Judge, Presiding

Argued and Submitted
November 3, 2010—San Francisco, California

Filed March 24, 2011

Before: Ronald M. Gould and Consuelo M. Callahan,
Circuit Judges, and Morrison C. England, Jr.,
District Judge.*

Opinion by Judge Gould

---

*The Honorable Morrison C. England, Jr., District Judge for the U.S.
District Court for Eastern California, Sacramento, sitting by designation.

## COUNSEL

Mike Bothwell (argued), Julie Keeton Bracker, and Richard J. Harris, Roswell, Georgia; Thomas Rogers, Phoenix, Arizona; for plaintiff-appellant Mary Angela Cafasso.

Mark G. Kisicki (argued), Lawrence Allen Katz, Peter S. Kozinets, and Thomas Michael Stanek, Phoenix, Arizona; J. William Koegel, Washington, DC; for defendant-appellee General Dynamics C4 Systems, Inc.

## OPINION

GOULD, Circuit Judge:

In this False Claims Act ("FCA") appeal, relator Mary Cafasso challenges orders of the district court dismissing her qui tam complaint, rejecting her proposed amended pleading, granting summary judgment on remaining claims, and awarding attorneys' fees.[1] We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

---

[1]Congress amended the FCA in May 2009 by enacting the Fraud Enforcement and Recovery Act, Pub. L. No. 111-21, § 4, 123 Stat. 1617, 1621 (2009). These amendments do not apply retroactively to this case. *See Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, 1327 n.3 (11th Cir. 2009) (explaining non-retroactivity of FCA amendments).

# I

Cafasso alleges that her former employer General Dynamics C4 Systems ("GDC4S"), a technology company that services the military, defrauded the government by withholding disclosure of new inventions which, GDC4S had agreed by contract, the government had rights to use and license. Cafasso discovered the alleged fraud, according to her complaint, and made repeated inquiries and requests for internal audits. She claims that as a result of her activities in that regard, GDC4S retaliated against her by eliminating her department and position. GDC4S denies those allegations.

After learning that her job would be terminated but before leaving GDC4S, Cafasso copied almost eleven gigabytes of data from company computers in anticipation of bringing a qui tam action. Within days of her departure, GDC4S realized that she had taken thousands of its internal documents. GDC4S filed suit in state court seeking to recover documents that it believed Cafasso took in violation of a confidentiality agreement that she executed when her employment began. The state court issued a temporary restraining order ("TRO") that required Cafasso to return the electronic files that she removed from GDC4S.

Two days later, Cafasso filed this qui tam action in federal district court with a conclusory six-page complaint. The complaint alleged FCA violations and retaliation. The district judge, at Cafasso's request, issued orders sealing the case and permitting Cafasso to inform the state court of the pendency of the qui tam action. With the orders and sealed complaint in-hand, Cafasso presented the state court with an ex parte request to lift the TRO, which the state court granted. The state court also stayed the state action in its entirety, although the Arizona Court of Appeals later reversed both orders. When the district court learned that Cafasso had used its orders to disrupt the state court suit, it vacated the orders that it had issued. GDC4S was then served with the complaint and

filed an answer and counterclaim. That counterclaim alleged, among other things, that Cafasso's appropriation of GDC4S's electronic files breached her confidentiality agreement with the company.

Continuing prosecution of the qui tam action, Cafasso lodged more specific allegations against GDC4S in an amended complaint. In response to GDC4S's objections about privileged information contained in that amended pleading, Cafasso filed a substitute amended complaint that struck the objectionable language. Around the same time, the United States announced that it would decline to intervene in the FCA action. Cafasso continued to litigate the matter in her own name.

The parties then began an acrimonious period of discovery. The district court's November 4, 2009, order recites numerous discovery abuses by Cafasso. Specifically, Cafasso refused to identify which documents, of the thousands she had appropriated, actually supported her claim or were privileged. Further, Cafasso sought discovery into 110 inventions that were not mentioned in her complaint, which the court prohibited. GDC4S asked by interrogatory that Cafasso "[i]dentify each specific provision of 31 U.S.C. § 3729(a)(1)-(7) of the False Claims Act ('FCA') that you allege in paragraph 173 of the Substitute Amended Complaint that Defendant 'knowingly violated' . . . ." In response, Cafasso stated that she "has not made a claim as described in this Interrogatory, nor does the law require that she claim such to have been the case." Because Cafasso's answer to this interrogatory appeared to abandon her qui tam allegations, GDC4S promptly filed a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Thereafter, Cafasso sought to file a 733-page second amended complaint, which the district court rejected for failing to state a "short and plain statement of the claim," as required by Federal Rule of Civil Procedure 8(a)(2). The district court granted GDC4S's motion for judg-

ment on the pleadings. It then denied Cafasso's subsequent motion to amend her pleading.

Both parties moved for summary judgment on the remaining claims (Cafasso's retaliation claim against GDC4S, and GDC4S's counterclaims against Cafasso). GDC4S prevailed on both motions, and the district court entered judgment and a permanent injunction against Cafasso. GDC4S then moved for an award of attorneys' fees, which the district court granted in part.

This appeal followed.

## II

We first address the district court's dismissal of Cafasso's qui tam claim pursuant to Federal Rule of Civil Procedure 12(c). Our review is de novo. *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009). When considering a Rule 12(c) dismissal, we must accept the facts as pled by the nonmovant, here, Cafasso. *Id.*; *see also Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969) ("For the purposes of a motion to dismiss, the material allegations of the complaint are taken as admitted."). We caution that the facts set forth below have not been determined judicially, but are rather what we think to be a fair summary of the complaint's[2] allegations.

## A

Cafasso worked as the chief scientist/technologist at GDC4S, a technology company that services the military, and was so employed at the predecessor-company that was acquired by General Dynamics in 2001. As a participant in the Advanced Telecommunications & Information Distribution Research Program ("ATIRP"), GDC4S's predecessor-

---

[2]We review the dismissal of Cafasso's Substitute Amended Complaint. For simplicity, we refer to this pleading as the "complaint."

company had contracted with the Army to assign to the United States certain rights to "subject inventions" developed in performance of military contracts. Specifically, ATIRP gives the government "license to practice or have practiced for or on behalf of the United States the subject invention throughout the world," and the right to require GDC4S to license the invention to anyone "upon terms that are reasonable under the circumstances." In other words, ATIRP grants the government the royalty-free right to use or have used on its behalf subject inventions, as well as the right to require GDC4S to license the inventions to another party (such as a competing contractor) on reasonable terms.

ATIRP also requires timely disclosure of applicable new inventions to the government. Once it discloses a new invention, GDC4S may opt to retain title to the invention, subject to the government's right to use or have used on its behalf, and to require licensing of, the invention. If GDC4S chooses not to retain title to the invention, the government may assume title. Cafasso worked in the office that identified, documented, and protected GDC4S's intellectual property. Her responsibilities included ensuring that GDC4S complied with ATIRP's requirements by, among other things, disclosing new inventions to the Army.

In early 2004, Cafasso became aware of what she believed was a scheme to deprive the United States of its ATIRP rights to a new invention. GDC4S had applied for a patent for an invention known as GE04582, but the United States Patent and Trademark Office had preliminarily rejected that application subject to a response from GDC4S. Rather than responding to the Patent Office—and telling the government so that it could protect its rights in the invention by preparing its own response—GDC4S instead opted to abandon the patent application and, according to Cafasso, delayed before notifying the government in order to deprive it of the opportunity to prepare a response.

Cafasso alleges that by refusing to prosecute its patent application, GDC4S had "claim[ed] ownership of . . . [the new] technology as [its] own trade secret," and had denied the United States an opportunity to protect its interest in the invention. Further, because GDC4S had not disclosed its newly invented technology to the government, competing contractors would not know to ask the government for permission to use the technology when bidding on later contracts. According to Cafasso, the government might therefore pay GDC4S or another contractor to invent technologies like GE04582 that either already had been invented or with respect to which the government already had the right to authorize its contractors to use free of charge. In other words, Cafasso alleges that the United States could potentially pay twice for the same technologies.

Cafasso reported her discovery about GE04582 to her supervisor and others in her office, but no corrective action was taken. Cafasso asked for an audit or internal review. No audit occurred. GDC4S thereafter eliminated the office in which Cafasso worked and terminated her employment, as well as that of her supervisor.[3] GDC4S maintains that this occurred as part of a routine corporate reorganization. Cafasso disputes this account, alleging that her termination was retaliatory.

After Cafasso was told that her position had been eliminated but before leaving GDC4S, she was tasked with performing due diligence in closing out the ATIRP contract. In performing this function, she contends, she discovered a number of other instances where new inventions had either not been properly disclosed to the United States, or where GDC4S had abandoned prosecution of its patent applications to the detriment of the government's rights to the invention.

---

[3]We address the timing of these events more specifically in the part of our opinion evaluating Cafasso's appeal of the summary judgment on her retaliation claim. *See infra* part IV.

Cafasso claims that GDC4S continues to deprive the United States of its rights to new inventions. She alleges that "[t]he scheme [is] implemented in two ways. For some inventions, the disclosure to the Government is made, but it is sketchy and insufficient. In other cases, [GDC4S] apparently has stopped submitting notification to the Government altogether."

**B**

**[1]** In reviewing the dismissal of a complaint, we inquire whether the complaint's factual allegations, together with all reasonable inferences, state a plausible claim for relief. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009).[4] The heightened pleading standard of Rule 9(b) governs FCA claims. *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001). Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy Rule 9(b), a pleading must identify "the who, what, when, where, and how of the misconduct charged," as well as "what is false or misleading about [the purportedly fraudulent] statement, and why it is false." *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010) (internal quotation marks and citations omitted).

**[2]** Until now, we have not had occasion explicitly to confirm that *Iqbal*'s plausibility requirement applies to claims subject to Rule 9(b). We have, however, said that "complaints alleging fraud must comply with both [Federal Rules of Civil

---

[4]Although *Iqbal* establishes the standard for deciding a Rule 12(b)(6) motion, we have said that Rule 12(c) is "functionally identical" to Rule 12(b)(6) and that "the same standard of review" applies to motions brought under either rule. *Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989); *see also Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010) (applying *Iqbal* to a Rule 12(c) motion); *Albrecht v. Treon*, 617 F.3d 890, 893 (6th Cir. 2010) (same); *Johnson v. Rowley*, 569 F.3d 40, 43-44 (2d Cir. 2009) (same).

Procedure] 8(a) *and* 9(b)." *Wagh v. Metris Direct, Inc.*, 363 F.3d 821, 828 (9th Cir. 2003), *overruled on other grounds by Odom v. Microsoft Corp.*, 486 F.3d 541, 551 (9th Cir. 2007) (en banc). Because Rule 8(a) requires the pleading of a plausible claim, *Iqbal*, 129 S. Ct. at 1949-50, we hold that claims of fraud or mistake—including FCA claims—must, in addition to pleading with particularity, also plead plausible allegations.[5] That is, the pleading must state "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the misconduct alleged]." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).[6]

## C

**[3]** We next consider whether the qui tam claim stated in Cafasso's complaint is sufficiently particularized and plausible to avert dismissal. "It seems to be a fairly obvious notion that a False Claims Act suit ought to require a false claim." *United States ex rel. Aflatooni v. Kitsap Physicians Serv.*, 314 F.3d 995, 997 (9th Cir. 2002). "[T]he [FCA] attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment.' " *United States v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995). As

---

[5]This holding is consistent with the law of other circuits. *E.g.*, *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1167 (10th Cir. 2010); *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1288-89 (11th Cir. 2010); *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010); *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009).

[6]*Iqbal* and its "plausibility" standard have been the subject of serious and thoughtful criticism. *E.g.*, Arthur R. Miller, *From Conley to Twombly to Iqbal: A Double Play on the Federal Rules of Civil Procedure*, 60 Duke L.J. 1 (2010). Also, at least one state court has disagreed with the wisdom of *Iqbal* and declined to adopt its plausibility standard for state court pleadings. *McCurry v. Chevy Chase Bank, FSB*, 233 P.3d 861, 863-64 (Wash. 2010). Nonetheless, pleading requirements for the federal courts have departed from the traditional Rule 8 standard under *Conley v. Gibson*, 355 U.S. 41, 47-48 (1957); under *Iqbal*, the pleading standard has changed and plausibility is required.

we have said, "[A]n actual false claim is 'the *sine qua non* of a[n FCA] violation.' " *Aflatooni*, 314 F.3d at 1002 (quoting *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002)).[7]

**[4]** False claims contemplated by the FCA take many forms. Of seven types of actionable conduct listed in the FCA, only three require that the misconduct involve an actual demand for payment. 31 U.S.C. §§ 3729(a)(1)-(3). In the remaining categories, the "false claim" lies in the fraudulent use of a receipt, §§ 3729(a)(4)-(5), unauthorized purchase of government property, § 3729(a)(6), or use of a "false record or statement" to avoid payment to the government, § 3729(a)(7). We recently held that a request for reimbursement that falsely implied compliance with federal rules could constitute a false claim. *Ebeid*, 616 F.3d at 996. But to commit conduct actionable under the FCA, one must, in some way, falsely assert entitlement to obtain or retain government money or property.[8]

Section 3729(a)(7) of the FCA—the "reverse false claims"

---

[7]*See also United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1173 (9th Cir. 2006) ("[F]or a false statement or course of action to be actionable . . . , it is necessary that it involve an actual claim . . . ."); *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1265 (9th Cir. 1996) ("The FCA . . . requires a false claim." (quoting the district court)).

[8]Cafasso confuses the FCA's requirement of a false claim with the concept of "presentment." In *United States v. Bourseau*, we held that relators bringing an action pursuant to § 3729(a)(7) need not allege that a claim was actually *presented* to the government, because it is sufficient to allege "that a defendant ma[d]e or use[d] a false record or statement in order to conceal, avoid or decrease an obligation to pay the government." 531 F.3d 1159, 1169 (9th Cir. 2008). Although it is not required that relators allege that a particular claim was actually *submitted* to the United States, this does not obviate the requirement that a fraudulent claim of some kind, presented or not, form the basis of FCA liability. *See Hagood v. Sonoma Cnty. Water Agency*, 81 F.3d 1465, 1479 (9th Cir. 1996) (rejecting a § 3729(a)(7) claim in part because the plaintiff had not established a false claim).

provision—does not say otherwise. It makes actionable the knowing use of a "false record or statement to conceal, avoid, or decrease an obligation . . . to transmit money or property to the Government." § 3729(a)(7). This provision "attempts to provide that fraudulently reducing the amount owed to the government constitutes a false claim." 1 John T. Boese, *Civil False Claims & Qui Tam Actions*, § 2.01[K] at 2-56 (3d ed. 2010). In *United States v. Pemco Aeroplex, Inc.*, for example, the defendant, under an obligation to account for government property in its possession, purposely misidentified airplane parts worth more than two million dollars as scrap metal worth only $1,875. 195 F.3d 1234, 1235-36 (11th Cir. 1999) (en banc). In reliance upon the misrepresentation, the United States allowed the defendant to purchase the parts for that deflated sum. *Id*. The "false claim" in *Pemco* was the inventory document fraudulently accounting for the value of government property. The "reverse false claims" provision does not eliminate or supplant the FCA's false claim requirement; it rather expands the meaning of a false claim to include statements to avoid paying a debt or returning property to the United States.

Cafasso's complaint alleges no false claim. While her pleading alleges that GDC4S's non-disclosure of new inventions deprived the United States of lower-cost services by third-party entities, it does not allege that GDC4S falsely asserted an entitlement to obtain or retain government money or property. It does not allege that GDC4S made a demand for payment, fraudulently used a receipt, participated in an unauthorized purchase of government property, or used a false record or statement.

**[5]** We consider whether, in the absence of pleading false claims, the complaint warrants an inference that false claims were part of the scheme alleged. *Ebeid*, 616 F.3d at 998-99. In assessing the plausibility of an inference, we "draw on [our] judicial experience and common sense," *Iqbal*, 129 S. Ct. at 1950, and consider " 'obvious alternative explana-

tion[s],' " *id.* at 1952 (quoting *Twombly*, 550 U.S. at 567). According to her complaint, Cafasso had worked in the office tasked with ensuring ATIRP compliance since the predecessor-company's acquisition in 2001. Even after she began to suspect fraud, she was responsible for reviewing ATIRP-related documents to conclude GDC4S's participation in the contract. Despite access to GDC4S records, as detailed in her complaint, she does not identify a single "false or fraudulent claim for payment," § 3729(a)(1), "false record or statement," § 3729(a)(2), (7), "document certifying receipt of property," § 3729(a)(5), or any other qualifying false claim. Assuming the truth of Cafasso's factual averments, an "obvious alternative explanation" of GDC4S's conduct is that it withheld disclosure of new inventions so it could continue to use them as trade secrets, which might be a breach of contract but not a fraudulent claim.[9] In light of Cafasso's failure to identify any particular false claims or their attendant circumstances, as well as the "obvious alternative explanation" that no false claims occurred, we will not draw the unwarranted and implausible inference that discovery will reveal evidence of such false claims.

**[6]** Cafasso tries to save her complaint by arguing that GDC4S may have charged the government directly for use of intellectual property that the government already had the right to use free of charge. But Cafasso's pleading contains none of

---

[9]As previously discussed, ATIRP grants the government the royalty-free right to use or have used on its behalf subject inventions, as well as the right to require the contractor to license the invention to another party on reasonable terms. To the extent that Cafasso's complaint may be construed to allege that GDC4S charged third-party contractors for their use of inventions that should have been, but were not, disclosed pursuant to ATIRP, the complaint contains no particular circumstances of any such charges, as required by Rule 9(b). Further, even if this allegation had been pled with sufficient specificity, it is not clear that the scheme would have involved any false claims, or that the scheme would have been genuinely fraudulent given ATIRP's contemplation that third-party contractors would pay to license GDC4S inventions on reasonable terms.

the "circumstances" attendant to this alleged fraudulent conduct. Fed. R. Civ. P. 9(b). As the district court correctly observed, "The pleading does not allege . . . when GDC4S 'charged' the government for previously-purchased technology, which contracts the charges related to, whether the reuse of technology actually inflated the charge, or if the government even paid the charges."[10] Indeed, the pleading does not point to a single invention for the use of which GDC4S charged the United States.

**[7]** This type of allegation, which identifies a general sort of fraudulent conduct but specifies no particular circumstances of any discrete fraudulent statement, is precisely what Rule 9(b) aims to preclude. *See Bly-Magee*, 236 F.3d at 1018 ("Rule 9(b) serves not only to give notice to defendants of the specific fraudulent conduct against which they must defend, but also to deter the filing of complaints as a pretext for the discovery of unknown wrongs, to protect defendants from the harm that comes from being subject to fraud charges, and to prohibit plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis." (internal quotation and alterations omitted)).

**[8]** None of the remaining qui tam allegations levied in Cafasso's complaint are cognizable under the FCA. Cafasso's allegations that GDC4S did not comply with ATIRP's disclosure requirements, and that GDC4S received payment from the United States pursuant to ATIRP, in essence fault GDC4S for allegedly breaching its contractual obligations. But "breach of contract claims are not the same as fraudulent conduct claims, and the normal run of contractual disputes are not cognizable under the [FCA]." *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 383 (4th Cir.

---

[10]We do not suggest that pleading any one of these circumstances is necessary to state an FCA claim. It is significant that Cafasso pleads none of them.

2008). To be sure, Cafasso's complaint alleges unsavory conduct. But unsavory conduct is not, without more, actionable under the FCA. *See Aflatooni*, 314 F.3d at 1002 ("It is not enough . . . 'to describe a [fraudulent] scheme in detail but then to allege simply and without any stated reason . . . that claims requesting illegal payments must have been submitted.' " (quoting *Clausen*, 290 F.3d at 1311)); *Hopper*, 91 F.3d at 1265 ("It is not the case that any breach of contract, or violation of regulations or law, or receipt of money from the government where one is not entitled to receive the money, automatically gives rise to a claim under the FCA." (quoting the district court)).[11] Given Cafasso's failure to plead a false claim, we affirm the district court's dismissal of Cafasso's complaint.

## III

We next consider the district court's denial of Cafasso's motion for leave to amend her complaint. Our review is for abuse of discretion. *United States ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1051 (9th Cir. 2001).

GDC4S brought its Rule 12(c) motion after nearly two years of discovery. Given that late stage of litigation, the district court suggested that Cafasso, rather than opposing the motion, instead seek to amend her pleading to cure the deficiencies identified in the motion. Acting on this suggestion, Cafasso moved to amend and tendered a 733-page proposed amended complaint. The district court denied Cafasso's motion for failure to comply with Rule 8(a), among other deficiencies.

---

[11]The United States Court of Appeals for the Fifth Circuit has wryly observed: "A hand in the cookie jar does not itself amount to fraud separate from the fib that the treat has been earned when in fact the chores remain undone." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009).

**[9]** Normally, when a viable case may be pled, a district court should freely grant leave to amend. *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1039 (9th Cir. 2002). However, "liberality in granting leave to amend is subject to several limitations." *Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989) (citing *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987)). Those limitations include undue prejudice to the opposing party, bad faith by the movant, futility, and undue delay. *Id.* Further, "[t]he district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint." *Id.* (citing *Leighton*, 833 F.2d at 186; *Mir v. Fosburg*, 646 F.2d 342, 347 (9th Cir. 1980)).

**[10]** The district court was well within its discretion to deny leave to amend for several reasons. First, amendment would have been futile considering the proposed pleading's extraordinary prolixity. Rule 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although normally "verbosity or length is not by itself a basis for dismissing a complaint," *Hearns v. San Bernardino Police Dep't*, 530 F.3d 1124, 1131 (9th Cir. 2008), we have never held—and we know of no authority supporting the proposition—that a pleading may be of unlimited length and opacity. Our cases instruct otherwise. *See, e.g.*, *McHenry v. Renne*, 84 F.3d 1172, 1177-80 (9th Cir. 1996) (upholding a Rule 8(a) dismissal of a complaint that was "argumentative, prolix, replete with redundancy, and largely irrelevant"); *Hatch v. Reliance Ins. Co.*, 758 F.2d 409, 415 (9th Cir. 1985) (upholding a Rule 8(a) dismissal of a complaint that "exceeded 70 pages in length, [and was] confusing and conclusory"); *Nevijel v. North Coast Life Ins. Co.*, 651 F.2d 671, 674 (9th Cir. 1981) (holding that Rule 8(a) is violated when a complaint is excessively "verbose, confusing and almost entirely conclusory"); *Schmidt v. Herrmann*, 614 F.2d 1221, 1224 (9th Cir. 1980) (upholding a Rule 8(a) dismissal of "confusing, distracting, ambiguous, and unintelligible plead-

ings"). While "the proper length and level of clarity for a pleading cannot be defined with any great precision," Rule 8(a) has "been held to be violated by a pleading that was needlessly long, or a complaint that was highly repetitious, or confused, or consisted of incomprehensible rambling." 5 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1217 (3d ed. 2010). Our district courts are busy enough without having to penetrate a tome approaching the magnitude of *War and Peace* to discern a plaintiff 's claims and allegations.

**[11]** Second, a 733-page pleading prejudices the opposing party and may show bad faith of the movant, both valid grounds to deny leave to amend. *See Ascon Prop.*, 866 F.2d at 1160. Rather than straightforwardly stating her claims and allegations, Cafasso would burden her adversary with the onerous task of combing through a 733-page pleading just to prepare an answer that admits or denies such allegations, and to determine what claims and allegations must be defended or otherwise litigated. *See McHenry*, 84 F.3d at 1178 ("[T]he very prolixity of the complaint ma[kes] it difficult to determine just what circumstances were supposed to have given rise to the various causes of action."); *Mendez v. Draham*, 182 F. Supp. 2d 430, 433 (D.N.J. 2002) ("Only through superhuman patience, effort, and insight, could any attorney review the allegations of the Complaint and make paragraph-by-paragraph responses."). As we have said,

> Prolix, confusing complaints . . . impose unfair burdens on litigants and judges. . . . Defendants are . . . put at risk that . . . plaintiffs will surprise them with something new at trial which they reasonably did not understand to be in the case at all, and that res judicata effects of settlement or judgment will be different from what they reasonably expected. . . . The judge wastes half a day in chambers preparing the "short and plain statement" which Rule 8 obligated plaintiffs to submit. He then must manage the litiga-

> tion without knowing what claims are made against whom. This leads to discovery disputes and lengthy trials, prejudicing litigants in other case who follow the rules, as well as defendants in the case in which the prolix pleading is filed.

*McHenry*, 84 F.3d at 1179-80. Further, Cafasso's proposed amendment sought to circumvent the district court's discovery order limiting her qui tam claim to allegations relating to the 37 inventions identified in her complaint.

**[12]** Citing our prior holding in *Hearns*, 503 F.3d at 1131, Cafasso argues that Rule 8(a) dismissals for excessive length are disfavored. At issue in *Hearns* was an 81-page complaint that, while "excessive [in] detail," was written with sufficient clarity and organization such that the defendants would "have no difficulty in responding to the claims." *Id.* at 1132. This case, however, is distinguishable. Cafasso's proposed complaint was more than nine times longer than the one before us in *Hearns*. Under these extraordinary circumstances, a district court has ample discretion to deny amendment. We affirm the district court's denial of Cafasso's motion to amend.

## IV

The district court granted summary judgment in favor of GDC4S on Cafasso's claim that her employment was terminated in retaliation for her investigation of fraud at the company. *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, No. 06-1381, 2009 WL 1457036, at *11-13 (D. Ariz. May 21, 2009). We review a grant of summary judgment de novo. *Universal Health Servs., Inc. v. Thompson*, 363 F.3d 1013, 1019 (9th Cir. 2004).

**[13]** The FCA protects employees from being "discharged, demoted, . . . or in any other manner discriminated against in the terms and conditions of employment . . . because of lawful acts done by the employee . . . in furtherance of an [FCA]

action . . . , including investigation for, initiation of, testimony for, or assistance in an [FCA] action . . . ." § 3730(h). An FCA retaliation claim requires proof of three elements: "1) the employee must have been engaging in conduct protected under the Act; 2) the employer must have known that the employee was engaging in such conduct; and 3) the employer must have discriminated against the employee because of her protected conduct." *Hopper*, 91 F.3d at 1269.

Cafasso's complaint alleges that GDC4S dismantled the office in which she worked, causing her termination, in retaliation for her inquiries regarding the ATIRP-related fraud that she suspected. GDC4S, on the other hand, maintains that it eliminated Cafasso's department and position as part of a corporate reorganization unrelated to Cafasso's conduct, and that the official who decided to eliminate Cafasso's department and position did not know about her ATIRP-related inquiries.

**[14]** Cafasso's protected conduct giving rise to her claim for retaliation is, according to her complaint, a series of inquiries and requests for an audit or internal review occurring in 2004 and 2005.[12] GDC4S's allegedly discriminatory acts, according to the complaint, took place in early 2006: The decision to eliminate Cafasso's department was announced in early January, and Cafasso was informed that her employment

---

[12]We assume without deciding that Cafasso's conduct was "in furtherance of" an FCA action. § 3730(h). GDC4S has argued that Cafasso's ATIRP-related conduct is not protected because the fraud she suspected is not actionable under the FCA and her investigations could not reasonably have led to a viable FCA action. *See Hopper*, 91 F.3d at 1269 ("[T]he plaintiff must be investigating matters which are calculated, or reasonably could lead, to a viable FCA action." (citing *Neal v. Honeywell Inc.*, 33 F.3d 860, 864 (7th Cir. 1994))). *But see Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.*, 275 F.3d 838, 845 (9th Cir. 2002) ("[A]n employee engages in protected activity where (1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is possibly committing fraud against the government."). We need not decide this issue because we affirm the district court on other grounds.

would be terminated the following month.[13] But Cafasso has adduced no evidence that these acts were causally related to her ATIRP-related inquiries and requests. Christopher Marzilli, the GDC4S official who eliminated Cafasso's department and position, testified that he did not know of her inquiries and requests at the time of his allegedly retaliatory decision. And Cafasso admitted in deposition that she had no reason to disbelieve Marzilli's account.

**[15]** Cafasso defends her retaliation claim by speculating that other GDC4S officials who did know of her protected conduct may have poisoned Marzilli against her—the "cat's paw" theory of liability. *See generally Poland v. Chertoff*, 494 F.3d 1174, 1182-83 (2007). The only evidentiary support she offers is first, the fact that some GDC4S officials who were in a position to influence Marzilli knew of her ATIRP-related inquiries and requests, and second, the cryptic statement of a coworker that unspecified "people" had, for unknown reasons, "poisoned the water," "gotten to Chris Marzilli," and "placed a cloak of poison over [Cafasso's] office with Chris Marzilli." This evidence, without more, is not enough to sustain Cafasso's burden at summary judgment. To prove this theory at trial, Cafasso would have to establish that one of Marzilli's subordinates, in response to Cafasso's protected activity, "set[ ] in motion" Marzilli's decision to eliminate Cafasso's department and job, and that the subordinate "influenced or was involved in the decision or decisionmaking process." *Poland*, 494 F.3d at 1182. The evidence adduced by Cafasso establishes only that this set of events could conceivably have occurred; it does not give rise to a reasonable inference that it did in fact occur. To find liability on this evidence

_____

[13]Cafasso's brief alleges a further retaliatory act: that GDC4S interfered with her efforts to find a new job within the company in the spring of 2006. This allegation does not appear in her complaint, so we will not entertain it here. *See Pickern v. Pier 1 Imps. (U.S.), Inc.*, 457 F.3d 963, 968-69 (9th Cir. 2006) (holding that new allegations must be raised by amended pleading).

would require undue speculation. To survive summary judgment, a plaintiff must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations. *Mackie v. Rieser*, 296 F.3d 909, 915-16 (9th Cir. 2002); *Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988). We affirm the district court's grant of summary judgment to GDC4S on Cafasso's FCA retaliation claim.[14]

## V

The district court also granted summary judgment to GDC4S on its counterclaim that Cafasso's appropriation of electronic documents and files violated a confidentiality agreement that Cafasso executed at the start of her GDC4S employment. *Cafasso*, 2009 WL 1457036, at *13-15.

The confidentiality agreement provides:

> During the time of my employment by [GDC4S], I will not disclose or use any Confidential Information except to the extent I am required to disclose or use such Confidential Information in the performance for [sic] my assigned duties for [GDC4S]; and I will use my best efforts to safeguard the Confidential Information and protect it against disclosure, misuse, espionage, loss and theft.

> After the termination of my employment . . . , I will not use any Confidential Information or disclose any

---

[14]Our holding is supported by the Supreme Court's recent decision in *Staub v. Proctor Hospital*, 131 S. Ct. 1186 (2011). There, the Court held that plaintiff Vincent Staub had proven employment discrimination on the "cat's paw" theory by producing evidence that his supervisors' actions "were motivated by hostility toward [his] military obligations" and "were causal factors underlying [the] decision to fire [him]." *Id*. at 1194. Further, "there was evidence that both [supervisors] had the specific intent to cause Staub to be terminated." *Id*. Cafasso lacks the causal evidence that was dispositive in *Staub*.

> Confidential Information to any person or entity who is not specifically authorized by [GDC4S] to receive it. . . .
>
> I will not remove any such materials from [GDC4S's] premises without the prior written consent of a corporate officer of [GDC4S]. Upon the termination of my employment with [GDC4S], or at any time requested, I shall promptly deliver to [GDC4S] all such materials and copies thereof in my possession an control.

Cafasso admits that the files she appropriated had information covered by the agreement. While not disputing that taking GDC4S files violated the agreement's terms, Cafasso nonetheless urges us to adopt a public policy exception to enforcement of such contracts that would allow relators to disclose confidential information in furtherance of an FCA action.

Although we see some merit in the public policy exception that Cafasso proposes, we need not decide whether to adopt it here. Even were we to adopt such an exception, it would not cover Cafasso's conduct given her vast and indiscriminate appropriation of GDC4S files. Cafasso copied nearly eleven gigabytes of data—tens of thousands of pages. She decided which GDC4S documents to copy by browsing through folders related to technology and technology development, and, she testified, "if I saw something that I thought actually could apply and should be investigated, *I just grabbed the whole folder*" (emphasis added). Further, she scanned only file names and "did not look at any individual documents at all." Swept up in this unselective taking of documents were attorney-client privileged communications, trade secrets belonging to GDC4S and other contractors, internal research and development information, sensitive government information, and at least one patent application that the Patent Office had placed under a secrecy order.[15] An exception broad

---

[15]Cafasso seeks to excuse her conduct on the grounds that she was in contact with, and providing information to, government investigators. This neither explains nor excuses the overbreadth of her seizure of documents.

enough to protect the scope of Cafasso's massive document gather in this case would make all confidentiality agreements unenforceable as long as the employee later files a qui tam action. *See JDS Uniphase Corp. v. Jennings*, 473 F. Supp. 2d 697, 702 (E.D. Va. 2007) ("[E]mployees would feel free to haul away proprietary documents, computers, or hard drives, in contravention of their confidentiality agreements, knowing they could later argue they needed the documents to pursue suits against employers . . . .").

**[16]** Were we to adopt a public policy exception to confidentiality agreements to protect relators—a matter we reserve for another day—those asserting its protection would need to justify why removal of the documents was reasonably necessary to pursue an FCA claim. Cafasso has made no such particularized showing. The need to facilitate valid claims does not justify the wholesale stripping of a company's confidential documents. Although courts perhaps should consider in particular instances for particular documents whether confidentiality policies must give way to the needs of FCA litigation for the public's interest, Cafasso's grabbing of tens of thousands of documents here is overbroad and unreasonable, and cannot be sustained by reference to a public policy exception. We affirm the district court's grant of summary judgment on GDC4S's contract claim.

## VI

Finally, we consider the district court's award of attorneys' fees to GDC4S for having prevailed on its contract claim. *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, No. 06-1381, 2009 WL 3723087 (D. Ariz. Nov. 4, 2009). We review a fee award for abuse of discretion. *Guy v. City of San Diego*, 608 F.3d 582, 586 (9th Cir. 2010).

**[17]** We take seriously Cafasso's concern that awarding fees against a qui tam claimant may chill prospective relators from exposing frauds on the government. This consideration

generally counsels against a fee award, and courts should not reject such arguments out of hand. However, relators and their attorneys are not free to engage in misconduct without consequences merely because those consequences might chill others. Further, the awarded fees cover GDC4S's successful contract claim, not Cafasso's FCA claim. We are confident that future litigants will appreciate the difference. The district court applied the correct legal standard, it did not abuse its discretion in applying that standard, and we affirm the fee award for substantially the reasons stated in its thorough November 4, 2009, order. *See Cafasso*, 2009 WL 3723087, at *5-8.

**AFFIRMED.**