**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

FEB 13 2013

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> and <br><br> CHARLES JAJDELSKI, ex rel., <br><br> Plaintiff - Appellant, <br><br> v. <br><br> KAPLAN. INC., <br><br> Defendant - Appellee. | No. 11-16651 <br><br> D.C. No. 2:05-cv-01054-KJD-GWF <br><br> MEMORANDUM[*] |

Appeal from the United States District Court
for the District of Nevada
Kent J. Dawson, District Judge, Presiding

Argued and Submitted December 7, 2012
San Francisco, California

---

[*]    This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36-3.

Before: O'SCANNLAIN and CALLAHAN, Circuit Judges, and EZRA, District Judge.[**]

Charles Jajdelski alleges that his former employer, a for-profit college owned by Kaplan, violated the False Claims Act, 31 U.S.C. §§ 3729-3733, by submitting financial aid claims to the U.S. Department of Education for students not genuinely in attendance and by making false representations to secure re-accreditation.

Kaplan filed a motion to dismiss pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), which the district court granted with prejudice. We affirm on the accreditation claim but reverse and remand on the claim based upon student enrollment.

I

A

1

Jajdelski was an Admissions Representative with experience doing the same job at another Kaplan-owned college. Compl. ¶ 7–8. He attended an October 25, 2003 Heritage graduation ceremony at which five boxes of diplomas were never distributed. Compl. ¶ 9. Suspicious about the widespread student absences, he

_____

[**] The Honorable David A. Ezra, United States District Judge for the District of Hawaii, sitting by designation.

2

made inquires with a Department Chairperson who first secured an assurance from Jajdelski that he could be trusted, and then who brought the Director of Education into the conversation "to tell [him] what was going on at Kaplan Heritage College." Compl. ¶ 11. The Director explained that the unused diplomas were for enrolled students who had either never begun, or had never completed, the curriculum. Compl. ¶ 12. When Jajdelski asked why Heritage would generate diplomas for such students, she replied that "instructors were required to keep the students enrolled in the programs on their attendance sheets for the duration of the program." Compl. ¶ 13.

As illustrations of this phenomenon, Jajdelski alleges (i) being given a memorandum about a specific student who had attended the college for four months and had withdrawn but who nonetheless "was graduated" and (ii) being instructed, without explanation, to stop his practice of personally verifying student enrollment. Compl. ¶ ¶ 64, 47. He further details being warned on December 2, 2003 by the College Director to "[k]eep [his] nose out of where it doesn't belong regarding students who did or did not graduate and the financial aid status of those students." Compl. ¶ 72. Jajdelski was told that if he were caught speaking to the Financial Aid Director again, his job would be in jeopardy. *Id.* Ten days later, he was fired.

3

Jajdelski also alleges that after the seventh day of any program offering, the College Director would meet with the Director of Financial Aid and each Admissions Representative. Compl. ¶ 46. The question of how many "students enrolled were 'fully packaged'" would be posed; as explained to Jajdelski, that terminology meant that the College's "financial aid request submitted to the federal government for Title IV funds and the associated funds received could now be drawn down for Kaplan's use." *Id*. He also alleges that various federal aid programs were available to Heritage. Compl. ¶ 40. Prospective students could not even receive a campus tour until they successfully completed an application for financial aid. Compl. ¶ 43–44.

## B

In dismissing his complaint the district court faulted Jajdelski for not identifying which false claims were submitted and when. Our court, though, has rejected that a *qui tam* relator must "identify representative examples of false claims" for his allegations. *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010). Instead, aligning with the Fifth Circuit's approach, we held "that it is sufficient to allege 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually

submitted.'" *Id.* at 998–99 (quoting *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)). That standard is met here because Jajdelski "alleges his first-hand experience of the scheme unfolding" and "describes in detail, including the date, place, and participants," meetings during which the phantom student scheme was revealed. *Grubbs*, 565 F.3d at 191–92. It would "stretch the imagination" to believe that Kaplan employees fastidiously (and secretively) documented fake student enrollment statistics and met about them once the threshold for financial aid eligibility was crossed, "only for the scheme to deviate . . . at the last moment" such that they did not submit those claims to the Department of Education. *Id.* at 192.

Thus, dismissal of this claim was error.

## II

Exercising our authority to affirm on any basis, we conclude that all of Jajdelski's other allegations were properly dismissed. *See United States v. Washington*, 573 F.3d 701, 706 (9th Cir. 2009). They are barred by the False Claims Act's six-year statute of limitations, 31 U.S.C. § 3731(b)(1), as they necessarily concern conduct that occurred on or before December 12, 2003, the day Kaplan fired Jajdelski, and Jajdelski did not assert them until his fourth amended complaint in June 2010. Jajdelski argues that relation back salvages them, yet

5

these allegations do not qualify for that doctrine because they do not arise "out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading."  Fed. R. Civ. P. 15(c)(1)(B).

We need not reach Jajdelski's argument that he ought to have been granted leave to amend, as that would not cure the timeliness defect.  *See Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004).

**AFFIRMED IN PART AND REVERSED IN PART.**  The parties shall bear their own costs.

6

*United States & Jajdelski, ex rel. v. Kaplan, Inc.*, No. 11-16651

CALLAHAN, Circuit Judge, dissenting:

I concur in Part II of the majority's memorandum disposition, but I respectfully dissent from Part I.

Claims brought pursuant to the False Claims Act are subject to heightened pleading requirements. Fed. R. Civ. P. 9(b); *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054-55 (9th Cir. 2011). Rule 9(b) "requires a party to state with particularity the circumstances constituting fraud or mistake, including the who, what, when, where, and how of the misconduct charged." *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010) (internal quotation marks omitted). While a plaintiff need not provide "representative examples of false claims to support every allegation," he must at least allege "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.* at 998-99 (quotation marks omitted); *see also United States ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1051-52 (9th Cir. 2001) (explaining that Rule 9(b) requires that a complaint be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong" (quotation marks omitted)).

Jajdelski's fourth-amended complaint does not satisfy these standards. As the majority points out, Jajdelski alleges that he discovered extra diplomas for an October 25, 2003, Heritage graduation ceremony that were never handed out, and that he had conversations with various Kaplan employees who told him about the practice by Kaplan admissions representatives of signing up phantom students. Jajdelski also makes allegations about Kaplan's (perfectly legitimate) process for acquiring and processing financial aid information from prospective students; Kaplan's equally legitimate enrollment goals; Kaplan's refusal to let Jajdelski see "actual" enrollment and attendance records; and "many of the college staff" being engaged in fraudulent activities occurring "before and after his employment."

While these allegations provide circumstantial support for Jajdelski's theory that Heritage, and subsequently Kaplan, engaged in a practice of signing up phantom students in order to receive financial aid, they do not tie the extra diplomas, employee confessions, or wrongdoing by apparently everyone at all times to *an actual false claim* for financial aid by Kaplan. *See Cafasso*, 637 F.3d at 1055 ("It seems to be a fairly obvious notion that a False Claims Act suit ought to require a false claim.") (quotation marks omitted); *see also United States ex rel. Aflatooni v. Kitsap Physicians Serv.*, 314 F.3d 995, 997 (9th Cir. 2002) ("[A]n actual false claim is 'the *sine qua non* of a False Claims Act violation.'" (citation

2

omitted)).

It is true that Jajdelski may, instead of providing "representative examples of false claims to support *every* allegation," set out the "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Ebeid*, 616 F.3d at 998-99 (emphasis added). But Jajdelski does not provide a representative false claim for *any* allegation. Nor does he provide "strong inference" that Kaplan actually submitted a false claim. Put another way, Jajdelski's complaint relies too much on innuendo, ultimately failing to lend the requisite specificity—"the who, what, when, where, and how," *Ebeid*, 616 F.3d at 998 (internal quotation marks omitted)—to his claim that "Kaplan submitted false claims to U.S. agencies."[1] Rule 9(b) requires the plaintiff,

[1] An adequate allegation might be, for example, that Kaplan enrolled Jane Doe in June 2003 for a four-month course; Kaplan submitted (or at least prepared to submit) financial aid forms to the government for Ms. Doe; Ms. Doe dropped out of her program in July 2003; and Ms. Doe's diploma was among those never handed out at the October 2003 graduation ceremony.

The closest Jajdelski comes to making such an allegation is in paragraph 64 of the fourth-amended complaint, in which he claims that, "several years prior" to October 23, 2003, a specific student attended Heritage, received and then sought deferment of financial aid, and was "graduated." According to Jajdelski, the student "presented to the college again a year prior" and "was put in classes to finish the program," but Kaplan listed her as "graduated" the entire time. However, Jajdelski does not say when the student "finished the program," and the events for which he gives specific dates all occurred before Kaplan acquired Heritage in May 2003. More important, these allegations do not actually claim (or strongly imply) that Kaplan received financial aid for the student while she was not

3

not appellate judges, to connect the dots.  Because Jajdelski has not done that here, despite many opportunities to do so, I respectfully dissent.

enrolled.

4

*United States & Jajdelski, ex rel. v. Kaplan, Inc.*, No. 11-16651

CALLAHAN, Circuit Judge, dissenting:

I concur in Part II of the majority's memorandum disposition, but I respectfully dissent from Part I.

Claims brought pursuant to the False Claims Act are subject to heightened pleading requirements. Fed. R. Civ. P. 9(b); *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054-55 (9th Cir. 2011). Rule 9(b) "requires a party to state with particularity the circumstances constituting fraud or mistake, including the who, what, when, where, and how of the misconduct charged." *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010) (internal quotation marks omitted). While a plaintiff need not provide "representative examples of false claims to support every allegation," he must at least allege "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.* at 998-99 (quotation marks omitted); *see also United States ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1051-52 (9th Cir. 2001) (explaining that Rule 9(b) requires that a complaint be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong" (quotation marks omitted)).

Jajdelski's fourth-amended complaint does not satisfy these standards. As the majority points out, Jajdelski alleges that he discovered extra diplomas for an October 25, 2003, Heritage graduation ceremony that were never handed out, and that he had conversations with various Kaplan employees who told him about the practice by Kaplan admissions representatives of signing up phantom students. Jajdelski also makes allegations about Kaplan's (perfectly legitimate) process for acquiring and processing financial aid information from prospective students; Kaplan's equally legitimate enrollment goals; Kaplan's refusal to let Jajdelski see "actual" enrollment and attendance records; and "many of the college staff" being engaged in fraudulent activities occurring "before and after his employment."

While these allegations provide circumstantial support for Jajdelski's theory that Heritage, and subsequently Kaplan, engaged in a practice of signing up phantom students in order to receive financial aid, they do not tie the extra diplomas, employee confessions, or wrongdoing by apparently everyone at all times to *an actual false claim* for financial aid by Kaplan. *See Cafasso*, 637 F.3d at 1055 ("It seems to be a fairly obvious notion that a False Claims Act suit ought to require a false claim.") (quotation marks omitted); *see also United States ex rel. Aflatooni v. Kitsap Physicians Serv.*, 314 F.3d 995, 997 (9th Cir. 2002) ("[A]n actual false claim is 'the *sine qua non* of a False Claims Act violation.'" (citation

2

omitted)).

It is true that Jajdelski may, instead of providing "representative examples of false claims to support *every* allegation," set out the "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Ebeid*, 616 F.3d at 998-99 (emphasis added). But Jajdelski does not provide a representative false claim for *any* allegation. Nor does he provide "strong inference" that Kaplan actually submitted a false claim. Put another way, Jajdelski's complaint relies too much on innuendo, ultimately failing to lend the requisite specificity—"the who, what, when, where, and how," *Ebeid*, 616 F.3d at 998 (internal quotation marks omitted)—to his claim that "Kaplan submitted false claims to U.S. agencies."[1] Rule 9(b) requires the plaintiff,

---

[1] An adequate allegation might be, for example, that Kaplan enrolled Jane Doe in June 2003 for a four-month course; Kaplan submitted (or at least prepared to submit) financial aid forms to the government for Ms. Doe; Ms. Doe dropped out of her program in July 2003; and Ms. Doe's diploma was among those never handed out at the October 2003 graduation ceremony.

The closest Jajdelski comes to making such an allegation is in paragraph 64 of the fourth-amended complaint, in which he claims that, "several years prior" to October 23, 2003, a specific student attended Heritage, received and then sought deferment of financial aid, and was "graduated." According to Jajdelski, the student "presented to the college again a year prior" and "was put in classes to finish the program," but Kaplan listed her as "graduated" the entire time. However, Jajdelski does not say when the student "finished the program," and the events for which he gives specific dates all occurred before Kaplan acquired Heritage in May 2003. More important, these allegations do not actually claim (or strongly imply) that Kaplan received financial aid for the student while she was not

3

not appellate judges, to connect the dots.  Because Jajdelski has not done that here, despite many opportunities to do so, I respectfully dissent.

---

enrolled.

4