146 F.3d 1177
 98 Cal. Daily Op. Serv. 5256, 98 Daily Journal
D.A.R. 7395
SHAMROCK FARMS COMPANY and Shamrock Foods Company,
Plaintiffs-Appellants,
v.
Ann M. VENEMAN, Secretary, Department of Food & Agriculture,
State of California, Richard Tate, Chief, Milk and Dairy
Foods Control Branch, Division of Animal Industry,
Department of Food & Agriculture, State of California,
Defendants-Appellees.
 No. 97-15428.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 11, 1998.
Decided July 2, 1998.
 
 John H. Vetne, Blodgett, Makechnie & Vetne, Newburyport, Massachusetts, for plaintiffs-appellants.
 Mark J. Urban, Deputy Attorney General of the State of California, Sacramento, California, Leonard R. Stein and Eugene M. Pak, Steefel, Levitt & Weiss, San Francisco, California, for defendants-appellees.
 Appeal from the United States District Court for the Eastern District of California; Lawrence K. Karlton, District Judge, Presiding. D.C. No. CV-96-00889-LKK.
 Before: D.W. NELSON, BOOCHEVER, and REINHARDT, Circuit Judges.
 REINHARDT, Circuit Judge:
 
 
 1
 Shamrock Farms operates a dairy farm in Arizona and sells the raw milk it produces to Shamrock Foods, a milk processor also located in Arizona. Shamrock Foods distributes packaged fluid milk products to a number of western states, including California. Together, Shamrock Farms and Shamrock Foods (collectively "Shamrock") filed suit against the state of California in federal district court alleging that various California laws and regulations governing the sale of milk products in that state violate the Commerce Clause. Shamrock asserts that the California provisions effectively prohibit out-of-state milk producers from selling their products in that state and impose an undue burden on interstate commerce. The district court dismissed Shamrock's claims pursuant to Fed.R.Civ.P. 12(b)(6), holding that a federal statute clearly authorizes California's laws and regulations and insulates them from Commerce Clause challenges.
 
 BACKGROUND
 
 2
 At issue in this case are various California regulations that govern the composition of consumer milk, in particular, those governing the content of both milkfat and solids-not-fat ("SNF"), as well as various California laws that govern milk pricing and pooling. The term "SNF" simply refers to solids (other than milkfat) naturally found in raw milk, which contain nutrients such as protein and calcium. The fat and SNF content of milk varies from "breed to breed, region to region, season to season, plant to plant, and farm to farm." It is possible to increase or standardize the natural SNF content of milk by adding a fortifying agent such as milk powder or condensed milk. When the SNF content is increased, the nutritional value of the milk increases as well.
 
 
 3
 Milk produced and distributed by Shamrock is subject to regulation by various federal agencies, including the Department of Agriculture, the Food and Drug Administration ("FDA"), and the Department of Health and Human Services ("HHS"). Pursuant to the Food, Drug and Cosmetic Act, the FDA and HHS have adopted standards of identity with respect to the milkfat and SNF content of milk sold in Shamrock's geographic region. 21 U.S.C. § 341. These federal identity standards, which are designed to inform consumers about the content of the milk they purchase and to protect against fraud and misrepresentation, require all milk (whether whole milk, lowfat milk, or skim milk) to be not less than 8.25% SNF. This percentage roughly reflects the average natural SNF content of all raw milk.
 
 
 4
 The state of California has adopted higher identity standards for milk sold within its borders. In order for milk processors to comply with California's compositional standards, they must fortify most of their milk by adding condensed milk or milk powder. Because Shamrock does not fortify, standardize, or otherwise increase the SNF content of its milk, it is effectively prohibited from selling whole and skim milk in California during certain seasons of the year. California's standards also effectively prohibit Shamrock from distributing its lowfat milk during the entire year.
 
 
 5
 In addition to regulating the composition of milk, California has also adopted milk pricing and pooling laws, which are designed to regulate and stabilize the state's milk market. Under these laws, all milk produced in California is pooled, and the state then sets minimum prices that California processors must pay individual California producers for the share of the raw milk they have supplied. These prices are based in part on the SNF content--the lower the SNF content, the lower the price. California also provides its milk processors with a fortification allowance, which reduces the cost of standardizing the milk. Shamrock asserts that California processors receive a competitive advantage against out-of-state processors because California only gives the fortification allowance to in-state processors.
 
 
 6
 Shamrock filed a complaint alleging that California's application of its milk composition standards and its pricing and pooling laws violates the Commerce Clause and the Fourteenth Amendment. Shamrock sought declaratory and injunctive relief, seeking to stop the state from enforcing its standards. California promptly moved to dismiss the complaint with prejudice pursuant to Fed.R.Civ.P. 12(b)(6), and the district court granted the motion. Shamrock moved for reconsideration of the dismissal order, which the district court denied. Shamrock appeals.
 
 DISCUSSION
 I. COMMERCE CLAUSE
 
 7
 Shamrock asserts that California's milk composition standards and pricing and pooling laws are violative of the Commerce Clause because they prohibit the free flow of milk products across state lines. Assuming that the facts alleged in the complaint are true, as we must when considering an appeal from a dismissal under 12(b)(6), we consider whether the district court correctly concluded that the laws and regulations at issue are exempt from challenge under the Commerce Clause. A dismissal under Rule 12(b)(6) is reviewed de novo. See Cohen v. Stratosphere Corp., 115 F.3d 695, 700 (9th Cir.1997).
 
 
 8
 In addition to being an affirmative grant of congressional authority, the Commerce Clause, which authorizes Congress "[t]o regulate Commerce ... among the several states," U.S. Const. art. I, § 8, cl. 3, is in its negative aspect also a limitation on the regulatory authority of the states. See Gibbons v. Ogden, 22 U.S. 1, 9 Wheat. 1, 6 L.Ed. 23 (1824) (Marshall, C.J.). Thus, although a state has power to regulate commercial matters of local concern, a state's regulations violate the Commerce Clause if they are discriminatory in nature or impose an undue burden on interstate commerce, either because they are not necessary to further the state's legitimate interests or because they "unreasonably favor[ ] local producers at the expense of competitors from other States." Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 154, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963) (citations omitted). If a state's laws are found to be nothing more than "economic protectionism" in disguise, they will be invalidated as a matter of course. Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 471, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981). Even laws that are applied evenhandedly and impose only an incidental burden on interstate commerce can be unconstitutional if the burden on commerce is " 'excessive in relation to the putative local benefits.' " Id. (quoting Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970)).
 
 
 9
 Notwithstanding these limitations on permissible state action, Congress has the authority to immunize state laws from Commerce Clause challenges. Western & Southern Life Ins. Co. v. State Bd. of Equalization, 451 U.S. 648, 653, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981); see also White v. Massachusetts Council of Constr. Employers, Inc., 460 U.S. 204, 213, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983) (noting that if state regulation is "specifically authorized by Congress, it is not subject to the Commerce Clause even if it interferes with interstate commerce"). In this case, California maintains that Congress insulated its milk laws and regulations from Commerce Clause challenges by enacting § 144 of the Federal Agriculture Improvement and Reform Act of 1996 (the "Farm Bill"). See Pub.L. No. 104-127, 110 Stat. 888 (1996). Accordingly, argues California, there is no need to assess the validity of its laws and regulations by determining whether the burden on commerce is justified in relation to the state's interest. See Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). If California's contention is correct and Congress has afforded its milk laws and regulations the protection it claims, there can be no merit to Shamrock's Commerce Clause argument. Our analysis thus turns on whether Congress has indeed authorized California to adopt and enforce its regulatory scheme regardless of the effect it may have on interstate commerce.
 
 
 10
 In 1990, Congress enacted the Nutritional Labeling and Education Act of 1990 ("NLEA"), a provision of which prohibits states from independently setting quality standards for foods that move in interstate commerce. Under the NLEA, however, the FDA has the authority to exempt certain state food standards from the NLEA's general preemptive effect. 21 U.S.C § 343-1(b). After the NLEA was passed, California petitioned the FDA for authorization to maintain its stringent standards for fluid milks. Before California received FDA approval, Congress passed the Farm Bill. Included in the Farm Bill is a provision that specifically applies to California's milk standards and eliminates the need for the state to obtain an exemption:
 
 
 11
 Nothing in this Act or any other provision of law shall be construed to preempt, prohibit, or otherwise limit the authority of the State of California, directly or indirectly, to establish or continue to effect any law, regulation, or requirement regarding:
 
 
 12
 (1) the percentage of milk solids or solids not fat in fluid milk products sold at retail or marketed in the State of California; or
 
 
 13
 (2) the labeling of such fluid milk products with regard to milk solids or solids not fat.
 
 
 14
 7 U.S.C. § 7254 (emphasis added).
 
 
 15
 California's milk standards and its pricing and pooling laws constitute an integrally related scheme. Because § 144 of the Farm Bill specifically refers only to the milk standards, we will discuss its effect on that part of the scheme first and then discuss its effect on the pricing and pooling laws.
 
 A.
 
 16
 It is evident that Congress intended to insulate California's milk standards from federal regulation, including under the NLEA: The statute clearly states that nothing in the Farm Bill "or any other provision of law" shall interfere with California's efforts to regulate the SNF content of milk sold within its borders. Shamrock argues, however, that although the statute may be clear with respect to insulating the regulations from preemption or prohibition under federal regulation, it is ambiguous with respect to whether it insulates California's regulations from challenges under the Commerce Clause. See Wyoming v. Oklahoma, 502 U.S. 437, 439, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992) (construing the Federal Power Act as insulating state laws from preemption, but not from the Commerce Clause).
 
 
 17
 As the Supreme Court has explained, if Congress intends to authorize state laws that violate the Commerce Clause, its intent must be manifest. "Congress must be 'unmistakably clear' before we will conclude that it intended to permit state regulation which would otherwise violate the dormant Commerce Clause." C & A Carbone, Inc. v. Town of Clarkston, 511 U.S. 383, 408, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994) (O'Connor, J., concurring) (quoting South-Central Timber Development, Inc. v. Wunnicke, 467 U.S. 82, 91, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984)). The requisite intent may be gleaned both from the language of the relevant statute and from the legislative history. See Sporhase v. Nebraska ex rel. Douglas, 458 U.S. 941, 960, 102 S.Ct. 3456, 73 L.Ed.2d 1254 (1982).
 
 
 18
 In light of the breadth of the language contained in the statute, we conclude that the state has met its burden of establishing that Congress intended to protect the milk standards from Commerce Clause limitations. Shamrock argues that the language "any other provision of law" is not broad enough to include the Commerce Clause. We disagree. We hold that by using the expression "any other provision of law" in the context it did here, Congress demonstrated its intent to encompass all law, whether it be statutory law, common law, or constitutional law.
 
 
 19
 If Congress had wanted to protect California's milk standards only against the proscriptions of federal statutes and regulations, it could easily have chosen to use narrower language, such as "any federal law or regulation." This phrase plainly refers to statutory enactments, their implementing rules and regulations, and probably even to decisional law. It is the type of phrase Congress used later in the same paragraph of the Farm Bill when, in referring to the means of establishing California's milk standards, it specifically referred to "any law, regulation, or requirement." By contrast, a general reference to any or all "law" connotes a much broader concept. See Bryan A. Garner, A Dictionary of Modern Legal Usage 503 (2d ed.1995) (noting that "a law" refers to "a particular and concrete instance of a legal precept," whereas "the law" describes "something much broader and more general"); "any other provision of law" is closer to "the law" than to "a law."
 
 
 20
 We are aware of no authority that would permit us to conclude that the Commerce Clause, or, for that matter, the Full Faith and Credit Clause, or the provision of the Twenty-Second Amendment to the Constitution that prohibits the election of any person to the Office of President more than twice, do not constitute "provisions of law." While neither the Constitution nor any individual article or amendment may be "a law," constitutional provisions are in ordinary English usage "provisions of law." That the Constitution is part of the law of this nation would seem to be beyond dispute.
 
 
 21
 We note also that the protection the Farm Bill affords California's milk standards is sweeping. It does not simply bar preemption. Rather, it states that no provision of law shall "preempt, prohibit, or otherwise limit" California's milk laws or regulations. The breadth of the Farm Bill's protection for California's milk standards fortifies our view that by using the term "any other provision of law," Congress intended to preserve those standards from any sort of challenge, including one based on Commerce Clause grounds.
 
 
 22
 Shamrock asserts that Wyoming v. Oklahoma, 502 U.S. 437, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992), and United Egg Producers v. Department of Agric., 77 F.3d 567 (1st Cir.1996), support its contention that while such a conclusion may indeed be possible, it is not consistent with the Supreme Court's jurisprudence in this area. We do not agree that either Wyoming v. Oklahoma or United Egg is of any assistance to Shamrock. In Wyoming v. Oklahoma, the issue was whether the so-called "saving clause" in the Federal Power Act,[1] which allowed states to regulate local electric power rates notwithstanding federal regulation over the electric power industry, also permitted Oklahoma to stabilize its rates by enacting discriminatory legislation. The Supreme Court struck down the state laws, finding that Congress had not evinced a clear intent to immunize all state laws related to power-rate regulation even when such laws interfered with interstate commerce. From the language of the statute ("lawful authority now exercised"), the Court reasoned that Congress merely intended to maintain the status quo, to preserve regulations that were lawful under the dormant Commerce Clause limitations on state regulation. 502 U.S. at 458, 112 S.Ct. 789. In other words, Congress intended to permit the states to carry on any and all activities in which they were lawfully engaged at the time of the passage of the act. If any of the state activities were unlawful at that time, either because they were in violation of some federal statute or in violation of the Constitution, the Act did not purport to make them lawful. Thus, the Federal Power Act preserved lawful state regulations and exempted them from preemption under that particular Act.
 
 
 23
 By contrast, the statutory language in the Farm Bill creates a blanket exclusion for California's milk standards, not just those considered to be "lawful" at the time of the bill's enactment. Moreover, the Farm Bill insulates those standards from "any provision of law" that may "otherwise limit" California's authority to maintain them, and not just from the provisions of the Farm Bill itself. Accordingly, Wyoming is clearly distinguishable from this case.
 
 
 24
 In United Egg, the First Circuit recently considered a Commerce Clause challenge to a Puerto Rican law that required all eggs imported into the commonwealth to bear a stamp indicating the state of origin. Puerto Rico argued that its egg regulations were authorized by Congress, relying on the Egg Products Inspection Act. 21 U.S.C. § 1052(b)(2). That Act provided:
 
 
 25
 [N]o State or local jurisdiction other than those in noncontiguous areas of the United States may require labeling to show the State or other geographical area of production or origin.
 
 
 26
 77 F.3d at 569. The First Circuit rejected Puerto Rico's argument that this exemption signified "approval of any and all egg-labeling requirements in those places regardless whether justified or unjustified by Dormant Commerce Clause considerations." Id. Instead it concluded that "Congress excepted ... Puerto Rico from the blanket prohibition it was placing upon egg-labeling in all other places." Id. The statute thus purported to insulate egg labeling laws only from the ban contained in the very same statute; it did not insulate egg labeling from any other provision of law. Additionally, the court stated that the legislative history was silent as to whether Congress intended for the exemption to insulate egg laws from Commerce Clause limitations. Accordingly, the court was unwilling to read the statute as broadly as Puerto Rico urged.
 
 
 27
 In this case, the relevant statutory language is of a wholly different character than the language in the egg labeling ban and the language of the statute in Wyoming, both of which protected state laws from being declared illegal under those particular statutes, and no more. Here, Congress was unmistakably clear in exempting California's milk standards from all provisions of law, wherever situated, not from coverage under a single statute.
 
 B.
 
 28
 Having determined that the milk compositional standards are immune from Commerce Clause challenge, we now turn to the pricing and pooling laws. Although § 144 of the Farm Bill does not specifically refer to these laws, as it does to the milk composition standards, we conclude that the pricing and pooling provisions fall under the ambit of the prohibition against indirect limitations on laws, regulations, or requirements regarding milk standards. As we have noted, the various elements of the milk fortification scheme are interrelated and mutually interdependent. The pricing and pooling provisions are, in short, an essential part of California's plan to maintain its milk composition standards.
 
 
 29
 Our task in this respect is made somewhat less difficult by Shamrock's concession during oral argument that the pricing and pooling laws were adopted in order to assist milk producers in complying with the milk content provisions. This concession is amply supported by the legislative history surrounding the passage of § 144 of the Farm Bill, which demonstrates that Congress intended that the milk pricing and pooling scheme be included in the exemption as a means of effecting California's milk composition standards.[2] See Hearings Before the Subcomm. on Livestock, Dairy and Poultry, 104th Cong., Apr. 20, 1995 (statement of Hon. Bill Thomas) (explaining that the success of California's milk standards is attributable to the state's pricing system); see also id. (statement of Craig S. Alexander, Dairy Institute of California) (discussing California's pricing and pooling system in the context of California's milk quality standards). From all accounts, the milk pricing and pooling laws were considered by all concerned to be an important element of California's milk regulation scheme. Further, the pricing and pooling laws themselves state expressly that their purpose is to ensure that milk with the state-mandated SNF content is readily available to Californians. See Cal. Food & Agr.Code § 61802(c) (determining that the pricing and pooling regulations are necessary to prevent economic disruption that could undermine the "standards of content and purity").
 
 
 30
 Accordingly, we conclude that California's milk pricing and pooling laws are also exempted from Commerce Clause challenge.II. FOURTEENTH AMENDMENT
 
 
 31
 In its complaint, Shamrock generally invoked the Fourteenth Amendment and now alleges that California's milk-related laws are prohibited under both the Equal Protection and Due Process Clauses. Although it is not clear that Shamrock raised these two provisions of law specifically in the district court, because the arguments are purely legal in nature, we may consider them here.
 
 
 32
 In assessing whether the state's laws and regulations violate the Equal Protection Clause, we apply the rational basis test. See Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 461, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981). Shamrock contends that California has no legitimate interest in requiring milk to have a certain level of SNF or in establishing pricing and pooling laws. We do not agree. It is evident that the state's purposes in enacting both the milk composition standards and the pricing and pooling laws are legitimate. Specifically, California's milk laws and regulations further the state's interests in maintaining a stable and plentiful supply of wholesome milk. See Cal. Food & Agr.Code §§ 61801, 61802. We have already recognized the legitimacy of these interests in Country Classic Dairies, Inc. v. Montana, Dept. of Commerce Milk Control Bureau, 847 F.2d 593, 596 (9th Cir.1988) (upholding Montana's milk laws against an equal protection challenge).
 
 
 33
 Because California's interests in enacting the milk laws and regulations are legitimate, Shamrock must allege facts in the complaint to show that those laws and regulations are arbitrary or not rationally related to the state's goals in order to withstand the state's motion to dismiss. Even assuming that the facts alleged in the complaint are true, Shamrock has simply failed to set forth facts that would support an equal protection violation. There is nothing in the complaint that so much as suggests that the milk laws are either arbitrary or unrelated to the state's efforts to ensure a plentiful supply of healthy milk for its citizens. It is insufficient to assert that the milk laws establish discriminatory classifications; the complaint must also allege facts to demonstrate that the classifications are arbitrary or that they are not rationally related to legitimate state interests.
 
 
 34
 Likewise, there is no merit to Shamrock's contention that a due process violation could be found under the facts alleged in the complaint. As with equal protection, rationality is the touchstone of due process analysis in cases of the type before us. Nothing in Shamrock's complaint suggests arbitrariness or a lack of rationality.
 
 CONCLUSION
 
 35
 Congress has insulated California's milk laws against Commerce Clause challenges, and the district court therefore properly dismissed Shamrock's claims pursuant to Rule 12(b)(6). We also conclude that there is no merit to Shamrock's other constitutional challenges, and that dismissal as to these claims was appropriate as well.
 
 
 36
 AFFIRMED.
 
 
 
 [1]
 The saving clause provided as follows:
 The provisions of this subchapter shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce, but ... shall not apply to any other sale of electric energy or deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line.
 16 U.S.C. § 824(b)(1).
 
 
 [2]
 The district court refused to look at legislative history because it determined that the statute was clear on its face. See Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253-54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) (admonishing courts to give effect to the plain meaning of statutes). Because the pricing and pooling laws are not specifically referenced in the statute, however, it is important to consider the legislative history here