**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

YAKIMA VALLEY MEMORIAL
HOSPITAL, a Washington nonprofit
corporation,
        *Plaintiff-Appellant,*

v.

WASHINGTON STATE DEPARTMENT OF
HEALTH; MARY C. SELECKY, in her
official capacity as Secretary of
the Washington State Dept. of
Health,
        *Defendants-Appellees.*

No. 10-35497

D.C. No.
2:09-cv-03032-EFS

YAKIMA VALLEY MEMORIAL
HOSPITAL, a Washington nonprofit
corporation,
        *Plaintiff-Appellee,*

v.

WASHINGTON STATE DEPARTMENT OF
HEALTH; MARY C. SELECKY, in her
official capacity as Secretary of
the Washington State Dept. of
Health,
        *Defendants-Appellants.*

No. 10-35543

D.C. No.
2:09-cv-03032-EFS

OPINION

Appeal from the United States District Court
for the Eastern District of Washington
Edward F. Shea, District Judge, Presiding

Argued and Submitted
March 10, 2011—Seattle, Washington

11207

Filed August 19, 2011

Before: Raymond C. Fisher, Ronald M. Gould and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Fisher

## COUNSEL

James L. Phillips (argued), Miller Nash, LLP, Seattle, Washington, for the appellant and cross-appellee.

Richard A. McCartan, Assistant Attorney General, Michael Steven Tribble (argued), Assistant Attorney General, Washington State Office of the Attorney General, Olympia, Washington, for the appellee and cross-appellant.

## OPINION

FISHER, Circuit Judge:

The Washington State Department of Health (Department) will not license Yakima Valley Memorial Hospital (Memorial) to perform certain procedures known as elective percutaneous coronary interventions (PCI), which are used to treat

diseased arteries of the heart. Examples of such procedures include stent implantation and laser angioplasty.[1] Although Memorial already performs PCI in emergencies (no license required), it cannot perform "elective" procedures without a license that is required as part of the state's broader "certificate of need" regulatory regime. *See* Wash. Admin. Code § 246-310-700.[2] According to the Department, the community Memorial serves does not need another PCI provider.

The concept of certificate of need regimes, which many states enforce, is to avoid private parties making socially inefficient investments in health-care resources they might make if left unregulated. A certificate of need program corrects the market by requiring preapproval for certain investments and, in theory, thereby ensures that providers will make only necessary investments in health care. One type of investment the state of Washington regulates is the capacity to perform "tertiary health services," which are specialized health-care services including PCI. *See* Wash. Rev. Code § 70.38.105(4)(f).[3] Congress made certificate of need regimes part of the federal government's national health planning policy in the National

---

[1] *See* Wash. Admin Code § 246-310-705(4) (defining PCI as including, but not limited to, seven "mechanical procedures and devices that are used by cardiologists for the revascularization of obstructed coronary arteries"); *see also id.* § 246-310-745(4) (defining PCI by reference to "diagnosis related groups" developed under a Centers for Medicare and Medicaid Services contract).

[2] *See* Wash. Admin. Code § 246-310-705(2) (defining "elective" to mean "a PCI performed on a patient with cardiac function that has been stable in the days or weeks prior to the operation," which is "usually scheduled at least one day prior to the surgical procedure"). The licensing requirement only applies to "adult" procedures, *see id.* § 246-310-700, which includes only those "performed on the planning area residents over fifteen years of age," *Id.* § 246-310-745(10) (Step 1b).

[3] For a statement of purpose, *see* Wash. Rev. Code §§ 70.38.015(2), 115; Wash. Admin. Code § 246-310-001; *Overlake Hosp. Ass'n v. Dep't of Health*, 239 P.3d 1095, 1098-99, 1101 (Wash. 2010) (en banc) (¶¶ 9, 18). For a description of tertiary health services, *see* Wash. Rev. Code § 70.38.025(14); Wash. Admin. Code §§ 246-310-010(58), -020(1)(d).

Health Planning and Resources Development Act of 1974 (NHPRDA). *See Nat'l Gerimedical Hosp. & Gerontology Ctr. v. Blue Cross*, 452 U.S. 378, 384 (1981) (noting that Congress intended to "assist in preventing overinvestment in and maldistribution of health facilities").[4] The NHPRDA conditioned federal funding on enforcement of certificate of need regimes as part of the congressional effort to reduce health-care inflation and achieve an adequate supply and distribution of health resources. *See id.* at 385-86; 42 U.S.C. § 300k (1976); *see also Walgreen Co. v. Rullan*, 405 F.3d 50, 52 (1st Cir. 2005). In response, Washington enacted its current certificate of need framework in 1979. *See* Wash. Rev. Code § 70.38.015.[5] Although Congress repealed the NHPRDA in 1986, leaving states free to abandon their certificate of need programs, Washington has continued its program. *Cf. Rullan*, 405 F.3d at 53 (noting that after 1986 "several states followed suit by repealing their certificate of need laws").

In 2007, the Washington legislature passed a law directing the Department to promulgate regulations requiring a certificate of need for elective PCI. *See* Wash. Rev. Code § 70.38.128. The Department responded in 2008 by promulgating the PCI regulations Memorial now challenges. *See* Wash. Admin. Code §§ 246-310-700-755. The PCI regulations, which are explained in detail below, (a) require that a licensed hospital perform at least 300 elective PCI procedures per year; and (b) provide that the Department shall issue a certificate of need only if projected demand in an applicant's geographic market exceeds the capacity of incumbent certificate holders by *at least* 300 procedures. Under this formula, Memorial has no hope of receiving a certificate of need in the

---

[4]*See* Pub. L. 93-641, 88 Stat. 2225, §§ 1-3 (1975) (formerly codified at 42 U.S.C. § 300k-300n-5) (repealed by Pub. L. 99-660, title VII, § 701(a), 100 Stat. 3743, 3799 (1986)).

[5]Washington, along with 23 other states, had a certificate of need program prior to 1979. However, Washington enacted its current program in direct response to Congress' enactment of the NHPRDA.

near future. Memorial operates a single nonprofit hospital in Yakima, Washington. The surrounding market is already served by the for-profit Yakima Regional Medical and Cardiac Center, which holds an elective PCI certificate and is the only competing hospital in the city of Yakima. The Department does not contest Memorial's assertion that the market's "need" will not exceed 300 procedures until 2022.

Memorial sued the Department after it promulgated the PCI regulations, arguing that the certificate of need requirement violates the dormant Commerce Clause by unreasonably burdening interstate commerce. Memorial also claimed that the Department's methodology for defining "need" is anticompetitive and preempted by § 1 of the Sherman Act because it allows incumbent certificate holders to expand their capacity and preclude new certificates. The Department moved to dismiss the case for failure to state a claim and lack of standing to raise a dormant Commerce Clause challenge. Although the district court held that Memorial had standing, it dismissed the case on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). *See Yakima Valley Mem'l Hosp. v. Wash. State Dept. of Health*, 717 F. Supp. 2d 1159 (E.D. Wash. 2010).

The district court held that Memorial failed to state a claim of antitrust preemption, holding that the PCI regulations were a unilateral restraint of trade not barred by the Sherman Act. With regard to the dormant Commerce Clause, the district court found Memorial had standing because it alleged it would participate in an interstate market for PCI patients, doctors and supplies. Nevertheless, the district court found that any burden on Memorial's interstate commercial activity was expressly authorized by Congress' approval of certificate of need regimes, making a dormant Commerce Clause violation impossible. Memorial appeals the judgment, and the Department cross-appeals the ruling on standing. We agree that Memorial failed to state a claim of antitrust preemption because the PCI regulations are a unilateral licensing require-

ment rather than an agreement in restraint of trade. We also agree that Memorial has standing under the dormant Commerce Clause, but we reverse the district court's judgment on that claim because the Department failed to prove congressional authorization for the PCI regulations.

## Discussion

The district court ruled on the pleadings under Federal Rule of Civil Procedure 12(c), so we assume the facts alleged in the complaint are true and review de novo whether Memorial stated a claim under the Sherman Act or dormant Commerce Clause. *See United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1053 (9th Cir. 2011).[6] "In reviewing the dismissal of a complaint, we inquire whether the complaint's factual allegations, together with all reasonable inferences, state a plausible claim for relief." *Id.* at 1054 (citing *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct. 1937, 1949—50 (2009)). We also review de novo whether the plaintiff has standing. *See Sierra Forest Legacy v. Sherman*, ___ F.3d ___, 2011 WL 2041149, at *9 (9th Cir. May 26, 2011); *Barnum Timber Co. v. EPA*, 633 F.3d 894, 905 n.3 (9th Cir. 2011).

---

[6]In granting the Rule 12(c) motion, the district court declined to consider two expert reports submitted by Memorial months after briefing and argument on the motion had concluded, because the reports were outside of the pleadings. Memorial appeals that decision, but the argument merits little discussion. Judgment on the pleadings is limited to material included in the pleadings. *See Schneider v. California Dept. of Corrections*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998); *see also Ranch Realty, Inc. v. DC Ranch Realty, LLC*, 614 F. Supp. 2d 983, 987-88 (D. Ariz. 2007). Otherwise, the proceeding is converted to summary judgment. *See* Fed. R. Civ. P. 12(d). The district court had discretion not to convert the motion for judgment on the pleadings into a summary judgment motion, *see Hamilton Materials, Inc. v. Dow Chem. Corp.*, 494 F.3d 1203, 1207 (9th Cir. 2007), and did not abuse its discretion here. To the extent Memorial's expert reports contain factual information, the district court reasonably found them unhelpful when submitted *after* the hearing on the motion to dismiss.

## A. The Sherman Act

### 1. Antitrust Preemption Requires a Per Se Violation

Memorial argues that the PCI regulations are preempted by Sherman Act § 1, which declares "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade . . . to be illegal." 15 U.S.C. § 1. There are two primary modes of analysis under Sherman Act § 1:

> The Supreme Court has repeatedly recognized that by the language of the Sherman Act, " 'Congress intended to outlaw only *unreasonable* restraints.' " *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)). "[M]ost antitrust claims are analyzed under a 'rule of reason,' according to which the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors. . . ." *State Oil*, 522 U.S. at 10. . . .

> "Some types of restraints, however, have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful *per se*." *State Oil*, 522 U.S. at 10. Such restraints " 'are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.' " *Nw. Wholesale Stationers*[*, Inc. v. Pac. Stationery and Printing Co.*], 472 U.S. [284,] 289 [(1985)](quoting *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958)).

*California ex rel. Harris v. Safeway, Inc.*,___ F.3d ___, 2011 WL 2684942 at *11 (9th Cir. 2011) (en banc). The blanket condemnation of per se analysis applies only where the "chal-

lenged practice [has] 'manifestly anticompetitive' effects and lack[s] 'any redeeming virtue.' " *Id.* (quoting *Con'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 58-59 (1977)). Otherwise, the rule of reason is the default mode of analysis. *See id.*

**[1]** The distinction between the rule of reason and per se analysis is important for federal preemption, which requires "an irreconcilable conflict between the federal and state regulatory schemes." *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982). Sherman Act § 1 preempts state law only "when the conduct contemplated by the statute is in all cases a *per se* violation" — without per se illegal conduct, there can be no certainty that the regulation conflicts with the Sherman Act. *Id.* at 661 (quoted by *Sanders v. Brown*, 504 F.3d 903, 910-11 (9th Cir. 2007)). Conduct "contemplated" by the regulation is that which it "mandates," "authorizes," or "places irresistible pressure" on a private party to commit. *Id*; *Sanders*, 504 F.3d at 910 (quoting *Rice*); *see also Costco Wholesale Corp. v. Maleng*, 522 F.3d 874, 885-86 (9th Cir. 2008) ("[T]o be struck down, the regulation or restraint must effect a per se violation of the Sherman Act."). Importantly, a state regulation is not preempted simply because it has anticompetitive effects. *See Fisher v. City of Berkeley*, 475 U.S. 260, 264 (1986).

**[2]** To determine whether a regulation facially conflicts with Sherman Act § 1, we first consider whether the challenged regulation involves (1) unilateral action by the state and is thus not subject to preemption (because there is no concerted action), *see id.* at 266-67 (citing *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984))[7]; or (2)

---

[7]*See also Hoover v. Ronwin*, 466 U.S. 558, 567-68 (1984) ("When the conduct is that of the sovereign itself, . . . the danger of unauthorized restraint of trade does not arise."); *Parker v. Brown*, 317 U.S. 341, 350-51 (1943) ("We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature.").

a hybrid of state and private action and is thus potentially subject to preemption, *see id.* at 267-69.[8] *See also Costco*, 522 F.3d at 887-89 (distinguishing between unilateral and hybrid regulations).

A regulation is a unilateral restraint when "[n]o further action is necessary by the private parties because the anticompetitive nature of [the] restraint is complete upon enactment." *Costco*, 522 F.3d at 890. "[P]ublic officials determine[ ] the nature and extent of the resulting consumer injury, with no degree of discretion delegated to private actors." *Id.* Consequently, any anticompetitive effects are the "logical and intended result" of the state's action, rather than the result of private parties being empowered to " 'dictate market conditions to others.' " *Id.* at 887 (quoting *Sanders*, 504 F.3d at 918). Because the state acts alone in creating the restraint, there is no concerted action to be evaluated for consistency with Sherman Act § 1. *See Fisher*, 475 U.S. at 267.

---

[8] A hybrid regulation is only *potentially* preempted because the private discretionary conduct it incorporates may not "in all cases [be] a *per se* violation." *Sanders*, 504 F.3d at 910-11; *see also id.* at 919 (holding that to be preempted as a per se illegal "hybrid restraint," a regulation must involve "a delegation of market power to private parties that is *per se* illegal" because "[o]therwise, the hybrid restraint could not be attacked as facially invalid"); *Fisher*, 475 U.S. at 270 (holding that where regulations lacked "the element of concerted action needed before they can be characterized as a per se violation," there could be no preemption). Not all delegations of discretion will amount to per se illegal restraints of trade — for example, the delegation might resemble a vertical non-price restraint uniformly analyzed under the rule of reason. *See Rice*, 458 U.S. at 661-62; *Costco*, 522 F.3d at 891 n.11.

Even a per se illegal hybrid restraint may be saved from preemption by the "state action" immunity doctrine. *See Fisher*, 475 U.S. at 265 (citing *Parker*, 317 U.S. at 341). We do not need to reach the question of state-action immunity, and thus our opinion should not be construed as an analysis of the state's supervision of PCI providers, despite the suggestion in *Costco* that state-action immunity and unilateral action analyses can be conflated. *See* 522 F.3d at 887 (citing *Snake River Valley Elec. Ass'n v. PacifiCorp*, 238 F.3d 1189, 1192 n.8 (9th Cir. 2001)).

In contrast, a hybrid restraint "may be attacked under [Sherman Act] § 1" as per se unreasonable. *324 Liquor Corp. v. Duffy*, 479 U.S. 335, 345 n.8 (1987) (quoting *Fisher*, 475 U.S. at 268) (quotation marks omitted). The "hallmark" of a hybrid restraint is the "*delegation* of discretion to private actors." *Costco*, 522 F.3d at 898 n.20. The key distinction is that the regulation leaves a gap in the restraint of trade for private parties to fill at their discretion. A regulation is not hybrid "*solely* because it produces an effect that could not be produced by agreement of private parties without violating the antitrust laws." *Id.* at 889 (emphasis added). Rather, hybrid regulations "merely enforce private marketing decisions," granting "a degree of private regulatory power" to the regulated parties. *Fisher*, 475 U.S. at 268 (citing *Rice*, 458 U.S. at 665 (Stevens, J., concurring in judgment)).[9]

[3] In light of the foregoing principles, we must decide whether the PCI regulations go beyond the anticompetitive tendencies of a licensing requirement and actually delegate a degree of regulatory power to incumbent licensees.[10] Memorial argues that the PCI regulations grant regulatory power to incumbent licensees by calculating the need for a new certificate based in part on the number of PCI procedures they per-

---

[9]General statements that a restraint is hybrid because "the federal antitrust laws pre-empt state laws authorizing or compelling private parties to engage in anticompetitive behavior," *324 Liquor*, 479 U.S. at 345 n.8, or because regulations "creating unsupervised private power in derogation of competition are subject to preemption," *Costco*, 522 F.3d at 889, must be understood in context. Not all potentially anticompetitive conduct creates an irreconcilable conflict with federal law, either because it is subject to the rule of reason or because it is unilateral action by private parties covered by Sherman Act § 2's fact-specific analysis. *See id.* at 891 n.11 (recognizing that a regulation "akin to a non-price vertical restraint" would be analyzed under the rule of reason).

[10]*See Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1439 & n.11 (1995) ("It is well known that some of the most insuperable barriers in the great race of competition are the result of government regulation." (quoting *United States v. Syufy Enters.*, 903 F.2d 659, 673 (9th Cir. 1990) (quotation marks omitted))).

form, thereby allowing the incumbent licensees to manipulate the number of PCIs they perform so as to exclude competing hospitals from the elective PCI market. We disagree, for reasons explained below. We begin with an analysis of the regulations.

## 2. The PCI Regulations Impose a Barrier to Entry

The Washington legislature ordered the Department to promulgate a certificate of need requirement for elective PCI addressing, "at a minimum, factors related to access to care, patient safety, quality outcomes, costs, and the stability of Washington's cardiac care delivery system and of existing cardiac care providers." Wash. Rev. Code § 70.38.128 (2007). In response, the Department promulgated regulations setting forth a variety of requirements for an elective PCI certificate of need. *See* Wash. Admin. Code §§ 246-310-700-755. Memorial challenges only the PCI regulations' methodology for calculating a community's need for an additional elective PCI provider. *See* Wash. Admin. Code § 246-310-745. As is apparent from the regulations, once the Department grants a hospital a certificate of need to perform elective PCI, the requirement that there be an unmet demand for 300 procedures before granting another certificate of need creates a barrier to entry for potential competing hospitals.

The Department calculates need based on dividing the state into 14 geographical markets (planning areas). *See id.* §§ 246-310-705(5), -745(10). A hospital applies for a certificate of need to serve a particular planning area. The Department then forecasts whether the planning area will have unmet demand for elective PCI procedures within five years. *See id.* § 246-310-745(10) (explaining a five-step numeric methodology). A planning area "needs" another provider of elective PCI only if projected demand exceeds current capacity by 300 procedures. *See id.* (Steps 4-5).[11]

---

[11]*See also* Wash. Admin. Code §§ 246-310-010(58), -715(2). If a planning area's net need is negative, the Department may revoke existing certificates of need. *See* Wash. Admin. Code §§ 246-310-715(2), -755(a).

Projected demand is based on the planning area's current "use rate" (procedures per 1,000 residents) in the "base year" and the planning area's estimated population in the "forecast year," five years into the future. *Id.* §§ 246-310-745 (1), (3), (5) & (10) (Steps 1-2). Assuming a constant use rate, the Department projects demand in the forecast year. That is, the projected demand is the current "use rate" multiplied by the forecasted population. If the projected demand sufficiently exceeds the planning area's current capacity, the Department will issue a certificate of need.

Current capacity is based on the volume of procedures performed by the planning area's existing certified PCI providers in the base year. The planning area's current capacity is "assumed to remain constant over the forecast period." *Id*. § 246-310-745(10) (Step 3). The Department calculates the planning area's net need for an additional provider by subtracting the current capacity from the projected demand. *See id.* (Step 4). If the difference exceeds 300 procedures, the Department will issue one certificate of need for every 300 excess procedures. That is, if there is excess demand from 301 to 599 procedures, the Department will issue only a single additional certificate of need. Similarly, if there is excess demand up to 299 procedures, the Department will not issue any new certificates. *See id.* (Step 5). The regulations' limitation on when hospitals may offer elective PCI procedures serves as a barrier to market entry for hospitals who, but for the certificate of need requirement, would begin offering elective PCI procedures and competing for those patients.

### 3. The PCI Regulations are a Unilateral Restraint Not Subject to Preemption

Memorial's challenge focuses on Step 3, which relies on incumbent certificate holders' "current capacity" to define whether need exists for an additional licensee. Memorial argues that, because incumbent hospitals can expand their

current capacity to meet demand, they can forestall entry of a competing PCI provider.

**[4]** Memorial mistakes the barrier to entry created by the licensing requirement, and its attendant anticompetitive effects, for a hybrid restraint. The Department licenses the first certificate of need holder in a planning area to perform as many PCI procedures as it wishes. The logical and intended result of the PCI regulations is that the Department will issue a second certificate of need only if the incumbent does not expand its capacity to meet growing demand. The PCI regulations create *market* power, but that is different from a hybrid regulation that delegates *regulatory* power.

That the Department leaves open the number of procedures that an incumbent licensee may perform does not mean it delegates regulatory power to licensees. The restraint of trade is the licensing requirement — a barrier to entry — and it is complete upon enactment. The state imposes the licensing requirements. The state decides what the licensing requirements will be and whether they are met. The state does not delegate any aspect of need calculation to private parties. Admittedly, the state takes notice of whether incumbent providers are meeting the needs of the planning area, but that responsiveness to private activity does not amount to a hybrid restraint. *See Fisher*, 475 U.S. at 269 (holding that despite the power of tenants to trigger enforcement of a regulated rent ceiling, the rent levels were set exclusively by the state and the ceiling thus was a unilateral restraint).

**[5]** Rather, the Department has decided that monopoly is preferable in the market for elective PCI; otherwise it would grant a second certificate when a planning area's demand exceeded 600 procedures annually — that is, when the market would support two competing providers both able to perform the minimum 300 procedures annually. That a licensee meets the Department's expectation and supplies all demand is the logical and intended consequence of the PCI regulations, not

a delegation of *regulatory* power to the incumbent. Entry is prohibited by the Department's decision to grant an unlimited license and then withhold additional licenses until the incumbent can no longer meet demand, not the incumbent's natural inclination to capitalize on the *market* power the licensing requirement creates.

**[6]** Moreover, an incumbent provider's discretion to increase supply unilaterally to meet demand is neither per se illegal nor recognizable as an element of a per se illegal agreement.[12] The only facet of the PCI regulations that could be equated with a per se illegal agreement is the division of the state into planning areas, but the licensees have no role in drawing the dividing lines.[13] It is true that within a planning area the incumbent certificate holders might conspire to jointly keep current capacity within 300 procedures of projected demand, but the PCI regulations neither require, encourage nor condone collusion. In short, nothing about the PCI regulations involves private discretion to engage in per se anticompetitive conduct.

Although this case deals with a barrier to entry, the case law on hybrid and unilateral restraints involving price-fixing is instructive. For instance, horizontal price fixing is per se illegal. *See Dagher*, 547 U.S. at 5. Agreements to post and hold prices have been found to be such prohibited horizontal

---

[12]At worst, capacity expansion, if motivated by a specific intent to monopolize with a dangerous probability of success, might be attempted monopolization under Sherman Act § 2, but that could not be decided on a facial challenge and thus could not warrant preemption. *See Fisher*, 475 U.S. at 270 n.2 (holding that an allegation of monopolization or attempted monopolization would "go[ ] beyond the scope of the facial [preemption] challenge presented here"); *Copperweld*, 467 U.S. at 774-75 (explaining Congress intentionally subjected unilateral, private conduct to a less demanding standard under Sherman Act § 2 than agreements under Sherman Act § 1).

[13]Horizontal market division is a "classic per se antitrust violation." *United States v. Brown*, 936 F.2d 1042, 1045 (9th Cir. 1991).

conduct. *See Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 649-50 (1980) (discussing *Sugar Inst. v. United States*, 297 U.S. 553, 601-02 (1936)). Thus, we held in *Costco* that a state regulation requiring competing wholesalers to post their prices and hold to those posted prices for a fixed period was a hybrid restraint. Such regulatory post-and-hold requirements do not mandate, authorize or compel the concerted action necessary to make a private post-and-hold system per se illegal. But the regulations do have the effect of delegating to private parties the discretion to set the posted price to be held — an anticompetitive arrangement they could not achieve legally by explicit agreement. *See Costco*, 522 F.3d at 895-96; *see also 324 Liquor*, 479 U.S. at 345 n.8 ("Our decisions reflect the principle that the federal antitrust laws pre-empt state laws authorizing . . . private parties to engage in anticompetitive behavior.").[14]

If the state fixes the price, however, the requirement that private parties adhere to the fixed price is a unilateral restraint. For example, in *Fisher*, the Supreme Court held that a regulation requiring private landlords to adhere to a maximum rent ceiling fixed by the state was a unilateral restraint. *See Fisher*, 475 U.S. at 269 ("Not just the controls themselves but also the rent ceilings they mandate have been unilaterally imposed on the landlords by the city."). The anticompetitive effects were the same as if the landlords had conspired, but the extent of the harm to competition was decided by the state and complete upon enactment of the regulation.

---

[14]The Supreme Court reached a similar result in holding preempted a regulation that compelled vertical resale price maintenance but allowed wholesalers to fix the price. *See 324 Liquor*, 479 U.S. at 341-42 (discussing *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 102-03 (1980)); *Fisher,* 475 U.S. at 268-69 (same); *Rice*, 458 U.S. at 659 (same). Although vertical resale price maintenance is no longer per se illegal, *Midcal* remains instructive. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 889 (2007) (overturning the per se rule against vertical resale price maintenance announced in *Dr. Miles Med. Co. v. John D. Park & Sons Co.*, 220 U.S. 373 (1911)).

Memorial argues that incumbent certificate holders' control over their PCI capacity makes them like the wholesalers in *Costco* (who were free to set their own prices), not the landlords in *Fisher* (for whom rent was fixed by regulation). Memorial fails to recognize that in a post-and-hold regime the restraint of trade is that private parties hold to their prices, whereas here the restraint is not that licensees are allowed to expand their capacity, but rather that the Department requires licenses and doles them out based on a standard skewed toward monopoly.

We made a similar distinction in *Costco*, which in addition to holding that a post-and-hold regulation was a hybrid restraint, held that a regulation requiring wholesalers to charge at least a 10-percent mark-up was a unilateral restraint. Although the minimum mark-up regulation "gave" private parties discretion to mark up higher than the minimum, the state did not create that discretion. Wholesalers could already mark up their prices unilaterally. The regulation simply created a floor on price competition without allowing private parties any role in setting what the floor would be. The regulated market was less competitive, but the restraint of trade was complete upon enactment of the regulation. Significantly, the state did not grant "to private parties a means to manipulate, and therefore control, the pricing decisions of other firms," in contrast to post-and-hold regulations. *Costco*, 522 F.3d at 899.

**[7]** In sum, "[t]he distinction between unilateral and concerted action is critical here" because the state unilaterally imposes the barrier to entry and unilaterally determines when to issue a new PCI license. *Fisher*, 475 U.S. at 266. Any anticompetitive effect from allowing the first licensee the option of holding a monopoly in the planning area is "part-and-parcel of the state-imposed licensing scheme." *Costco*, 522 F.3d at 890. There is neither a per se illegal agreement nor its functional equivalent to turn the PCI regulations into a hybrid restraint. Absent a hybrid restraint or other per se violation of

the antitrust laws, there is no preemption and the district court properly granted judgment on the pleadings.[15]

## B. The Dormant Commerce Clause

[8] Memorial's complaint alleges that the PCI regulations violate the dormant Commerce Clause by placing an undue burden on interstate commerce.[16] If it were not for the licensing requirement, Memorial would offer elective PCI to out-of-state patients, as well as hire out-of-state doctors and import medical supplies from out-of-state to perform the procedures. There is no allegation of intentional discrimination against interstate commerce, but "[e]ven laws that are applied even-handedly and impose only an incidental burden on interstate commerce can be unconstitutional." *Shamrock Farms Co. v. Veneman*, 146 F.3d 1177, 1179 (9th Cir. 1998); *see also C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 389 (1994) ("It is well settled that actions are within the domain of the Commerce Clause if they burden interstate commerce or impede its free flow."). Where a law only incidentally burdens interstate commerce, it "will be upheld unless the burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits." *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338-39 (2008) (quoting *Pike v. Bruce*

---

[15]Memorial complains that by rejecting its allegation that the PCI regulations are a hybrid restraint of trade, the district court did not construe the facts alleged in the complaint in its favor. Whether a regulation is a hybrid restraint of trade is a question of law, *see* Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, vol. XI ¶ 1909b (2d ed. 2000) (explaining that identification of per se illegal restraints is a question of law, citing *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 337 n.3 (1982)), so there was no need to construe that allegation in Memorial's favor.

[16]The Commerce Clause of the Constitution explicitly grants Congress authority to regulate interstate commerce. *See* U.S. Const. art. I, § 8, cl. 3. As a corollary, the Commerce Clause implicitly limits the regulatory authority of the states over interstate commerce. This inference is commonly referred to as the dormant Commerce Clause. *See Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009).

*Church, Inc.*, 397 U.S. 137, 142 (1970)) (quotation marks and alteration omitted).

We must decide whether Memorial has standing to raise a dormant Commerce Clause challenge under *Pike*, and if so, whether the PCI regulations are immunized by congressional authorization. The ultimate question of whether the PCI regulations survive *Pike* scrutiny is not before us.

## 1. Memorial has standing to raise a dormant Commerce Clause challenge

**[9]** Standing includes two components: Article III constitutional standing and prudential standing. See *City of L.A. v. Cnty. of Kern*, 581 F.3d 841, 845 (9th Cir. 2009). The Department challenges only Memorial's prudential standing.[17] As relevant here, prudential standing requires that "the plaintiff's complaint must 'fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.' " *Individuals for Responsible Gov't, Inc. v. Washoe Cnty.*, 110 F.3d 699, 702-03 (9th Cir. 1997) (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982)). The zone-of-interests test "denies a right of review if the plaintiff's interests are . . . marginally related to or inconsistent with the purposes implicit in the relevant constitutional provision." *Id.* at 703 (quoting *Wyoming v. Oklahoma*, 502 U.S. 437, 469 (1992) (Scalia, J., dissenting)) (omission in original) (quotation marks and alteration omitted). Thus, we must first identify the purpose of the dormant Commerce Clause.

"The chief purpose underlying [the Commerce] Clause is to

---

[17]Recognizing that Article III standing is jurisdictional and can neither be waived by the parties nor ignored by the court, we are independently satisfied that Memorial has Article III standing under *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). *See Cnty. of Kern*, 581 F.3d at 845.

limit 'the power of the States to erect barriers against interstate trade.' " *Washoe Cnty.*, 110 F.3d at 703 (quoting *Dennis v. Higgins*, 498 U.S. 439, 446 (1991)). The intent is to promote a national market and "the free flow of goods and services through the several states; it is the *economic* interest in being free from trade barriers that the clause protects." *S.D. Myers, Inc. v. City & Cnty. of S.F.*, 253 F.3d 461, 471 (9th Cir. 2001) (citing *C&A Carbone*, 511 U.S. at 390; *On the Green Apartments L.L.C. v. City of Tacoma*, 241 F.3d 1235, 1238 (9th Cir. 2001)). The ultimate question, therefore, is whether Memorial's claims "bear more than a marginal relationship to claims addressing a state or county's effort to erect barriers to interstate commerce." *Cnty. of Kern*, 581 F.3d at 847 (quotation marks omitted).

**[10]** "As the name implies, the zone of interests test turns on the *interest* sought to be protected, not the *harm* suffered by the plaintiff." *Id.* at 848. Any alleged injury "must somehow be tied to a barrier imposed on interstate commerce." *Id.* Here, the barrier to interstate commerce is the requirement of a certificate of need to offer elective PCI to *all* patients, instate or out-of-state. By virtue of the certificate of need requirement, the Department prevents Memorial from soliciting out-of-state patients and competing in an interstate market to offer elective PCI services, activities that clearly involve interstate commerce. *See Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 329-30 (1991). Under *Pike* such incidental effects on interstate commerce are an unconstitutional barrier to trade if they are "clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142.

**[11]** The Department contends that Memorial lacks standing because it operates only an in-state hospital. The Commerce Clause, however, protects the vitality of the national market for goods and services, not the location of a particular participant, and thus a state burdens the rights of its own residents as well as those of other states when it burdens interstate commerce. Although the dormant Commerce Clause

primarily targets discrimination against out-of-state economic activity, under *Pike* it prohibits all unjustifiable burdens on interstate commerce. *See Kleenwell Biohazard Waste and Gen. Ecology Consultants, Inc. v. Nelson*, 48 F.3d 391, 392, 398-99 (9th Cir. 1995) (reviewing a facially neutral licensing regime under *Pike* where the plaintiff was an in-state "corporation with all of its facilities located within the state"). Memorial's alleged injury is thus tied to an alleged violation of the dormant Commerce Clause. The district court correctly held that prudential standing is satisfied.

## 2.  Congress has not authorized the 2008 PCI regulations

[12]  "It is well established that Congress may authorize the States to engage in regulation that the Commerce Clause would otherwise forbid." *Maine v. Taylor*, 477 U.S. 131, 138 (1986) (citing *S. Pac. Co. v. Ariz. ex rel. Sullivan*, 325 U.S. 761, 769 (1945)); *see Ne. Bancorp, Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 472 U.S. 159, 174 (1985). Congressional authorization must be " 'unmistakably clear' " and "unambiguous." *Taylor*, 477 U.S. at 139 (quoting *South-Central Timber Dev. Inc. v. Wunnicke*, 467 U.S. 82, 91 (1984)). Congress must clearly evince its intent "to alter the limits of state power otherwise imposed by the Commerce Clause." *Id.* (quotation marks omitted) (quoting *United States v. Pub. Utils. Comm'n of Cal.*, 345 U.S. 295, 304 (1953); *see South-Central Timber*, 467 U.S. at 91 (requiring clear evidence that Congress "affirmatively contemplate[d] otherwise invalid state legislation"). Congressional authorization is a defense that the state must prove. *See Wyoming*, 502 U.S. at 458.

[13]  The district court granted judgment on the pleadings to the Department because it concluded Congress had authorized certificate of need programs in the National Health Planning and Resources Development Act of 1974 (NHPRDA). *See supra* n.4. Although recognizing that the NHPRDA had been repealed in 1986 before the Department promulgated the challenged regulations in 2008, the district court accepted the

repealed statute as a prima facie authorization and erroneously put the burden on Memorial to prove the significance of repeal. We reverse because the Department has failed to show that the NHPRDA, a statute repealed without a savings clause, provides the requisite clear statement of authorization for the 2008 PCI regulations.[18] We do not decide whether the NHPRDA is sufficient authorization for certificate of need requirements established prior to repeal.

**[14]** The Department argues that the NHPRDA was a clear statement of authorization for certificate of need regimes because the statute made them a condition of federal funding. Memorial disputes whether this suffices as a sufficiently clear statement of authorization, but we need not decide the question. Whatever the NHPRDA authorized prior to 1986, after Congress repealed the statute there was no NHPRDA left to authorize a regulation promulgated in 2008. For more than a century, "the general rule . . . [has been] that when an act of the legislature is repealed, it must be considered, except as to transactions past and closed, as if it never existed." *Ex Parte McCardle*, 74 U.S. 506, 514 (1868) (quotation marks omitted). Even in a pending action, "no judgment could be rendered . . . after the repeal of the act under which it was brought and prosecuted." *Id.* A statute that Congress snuffed out of existence by repeal leaves no residual clear statement of authorization.

**[15]** Had Congress meant to perpetuate its alleged authorization for certificate of need programs, it could have included a savings clause in the repeal.[19] The savings clause would then

---

[18]The burden did not fall on Memorial to rebut the alleged clear statement in the NHPRDA because there was no NHPRDA in force to make a clear statement. A different situation arose in *Central Valley Chrysler-Jeep v. Witherspoon*, 456 F. Supp. 2d 1160 (E.D. Cal. 2006), which put the burden on the plaintiff to prove that an apparently clear statement of authorization had in fact been implicitly revoked by subsequent legislation. *See id.* at 1185. Here, there is no doubt the NHPRDA was repealed.

[19]The repeal stated:

  Sec. 701. Repeal of Title XV

itself be an unmistakably clear statement of authorization. Savings clauses can be used to preserve state authority from implied preemption when Congress passes a statute. *See, e.g.*, *Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1010 (9th Cir. 2010); *Qwest Corp. v. Ariz. Corp. Comm'n*, 567 F.3d 1109, 1117-18 (9th Cir. 2009). By the same token, Congress could enact a savings clause to avoid the natural implication of repealing an act. *Cf. Daghlian v. DeVry Univ., Inc.*, 574 F.3d 1212, 1213 (9th Cir. 2009) (order) (dismissing for lack of jurisdiction because the California statute under which the plaintiff sued "was repealed without a savings clause" to preserve pending claims). Instead, Congress repealed the NHPRDA with terse language that, at best, leaves it ambiguous whether Congress affirmatively contemplated the fate of state certificate of need programs.

**[16]** To the extent there is ambiguity, the Department offers no legislative history to inform our interpretation of it. The district court relied on President Reagan's signing statement, but even if a presidential signing statement could establish an unmistakably clear *legislative* intent, President Reagan's opinion does not amount to an unmistakably clear statement of authorization for the Department's PCI regulations. *See* Statement of President Ronald Reagan upon Signing S. 1744, 22 Weekly Comp. Pres. Doc. 1565, 1566 (Nov. 14, 1986).[20] Ultimately, the Department is reduced to arguing

---

(a) Repeal — Title XV of the Public Health Services Act is repealed effective January 1, 1987.

(b) Funds — The repeal made by subsection (a) shall not affect any funds obligated for the purposes of title XV of the Public Health Service Act before January 1, 1987.

Pub. L. No. 99-660, tit. VII, § 701, 100 Stat. 3743, 3799 (1986).

[20]President Reagan said:

It is also with great pleasure that I can finally lay to rest the Federal health planning authorities. I have sought their repeal since

that we can infer authorization from congressional silence — that Congress could not have meant to pull the rug out from under the states after inducing their transition to certificate of need programs, so Congress must have meant to leave undisturbed its authorization for certificates of need. As the district court's agreement demonstrates, that may be a reasonable inference. Congressional silence is not a clear statement, however. *See Sossamon v. Texas*, ___ U.S. ___, 131 S. Ct. 1651, 1660 (2011). Accordingly, we hold that the repealed NHPRDA does not provide congressional authorization for the 2008 PCI certificate of need regulation.

## CONCLUSION

**[17]** We hold that there is no antitrust preemption because the PCI regulations are a unilateral restraint of trade not subject to preemption. We also hold that Memorial has standing to raise a dormant Commerce Clause challenge under *Pike,* because the PCI regulations burden the free flow of commerce to Memorial's financial detriment. We reverse judgment on the dormant Commerce Clause claim, however, because the Department failed to prove congressional authorization for its PCI certificate of need regulations. We remand for further proceedings on Memorial's dormant Commerce Clause claim consistent with this opinion. The parties shall bear their own costs.

**AFFIRMED IN PART, REVERSED IN PART, REMANDED**.

---

I assumed office. These authorities, while perhaps well-intentioned when they were enacted in the 1970's, have only served to insert the Federal Government into a process that is best reserved to the marketplace. Health planning has proved to be a process that was costly to the Federal Government, in the last analysis without benefit, and even detrimental to the rational allocation of economic resources for health care.